Brian M. ABRAHAM, Petitioner,

v.

State of KANSAS; Carla Stovall, Attorney General, Respondents.

No. 00–3352–DES.

United States District Court, D. Kansas.

July 19, 2002.

Brian M. Abraham, Norton, KS, pro se.

Jared S. Maag, Kristafer R. Ailslieger, Office of Atty. General, Topeka, KS, for respondent.

### *MEMORANDUM AND ORDER*

SAFFELS, District Judge.

This matter is before the court on a Petition for a Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254. Within this action, petitioner seeks federal habeas relief from his state convictions.

Petitioner has filed a Memorandum in Support (Doc. 1), respondents have filed an Answer and Return (Doc. 8), and petitioner has filed a Traverse (Doc. 14). After considering the parties' papers, the court is prepared to rule. For the following reasons, petitioner's request shall be denied.

## I. BACKGROUND

### A. Factual History

In the fall of 1995, as a means of seeking leniency in some unrelated criminal charges, petitioner began cooperating with law enforcement officials within Kansas. As a confidential informant, petitioner developed a working relationship with Kansas Highway Patrol Trooper Dan Meyer. In October of 1995, petitioner and Trooper Meyer arranged for a controlled sale of narcotics to be conducted in Wichita, Kansas. Trooper Meyer contacted Special Agent Brandau of the Kansas Bureau of Investigations ("KBI") to assist in the operation.

On the morning of November 3, 1995, Agent Brandau met with petitioner in a hotel room rented by petitioner. The plan was for Agent Brandau to accompany petitioner to the suspects' residence posing as a methamphetamine dealer. Petitioner was responsible for vouching for Agent Brandau, but petitioner was not to have any direct involvement in the sale. Two of the suspects were then to travel with Agent Brandau to a second location to make the transaction. Petitioner was instructed to remain at the residence with the remaining suspect. Petitioner and Agent Brandau agreed, that in order to conceal petitioner's cooperation, petitioner would, at the conclusion of the operation, be arrested along with the suspect who remained at the residence. All the parties

understood that petitioner's arrest would merely serve as an illusion.

The ruse was successful. The two suspects were arrested at the purchase location by Agent Brandau, and, back at the residence, the remaining suspect and petitioner were subsequently placed under arrest.[1] Petitioner was then transported to the Sedgwick County Sheriff's Department and placed in an interview room.[2]

At the residence, Agent Brandau, aided by additional law enforcement officers, searched the home and its surroundings pursuant to a search warrant. Because petitioner and Agent Brandau had driven to the residence in petitioner's vehicle, the vehicle was still parked in the street near the residence. During the search, an officer looked into the vehicle and observed "ZigZag" rolling papers within the vehicle. Apparently prompted by the large amount of marijuana already discovered in another vehicle parked at the residence, the officer conducted a full search of petitioner's vehicle. Inside, the officer located a small amount of marijuana and a set of electronic scales.[3]

The discovery of the items in petitioner's vehicle raised Agent Brandau's suspicions that petitioner was involved in illegal narcotics activity unconnected to the sting operation. After arriving at the Sheriff's Department to assist in interviewing and processing the suspects, Brandau, in consultation with Trooper Meyer, requested that another KBI agent, Agent Bradley,

ask petitioner about the seized items and seek petitioner's consent to search his hotel room. Petitioner explained to Agent Bradley that the marijuana was given to him by the suspects. Agent Bradley confirmed this fact with Agent Brandau. However, when asked about the scales, petitioner "became very nervous, upset, and asked to talk to Trooper Meyer." (Suppression Hr'g Tr. at 64).

Trooper Meyer entered the room, and petitioner was again asked to consent to a search. Petitioner questioned what was "going on" and asked why he could not be released. (Suppression Hr'g Tr. at 36–37). Petitioner was again asked to consent, but he refused. As both officers were leaving the room, petitioner called for Trooper Meyer to remain. Apparently without any prompting by Trooper Meyer, petitioner stated he had some "stuff" in his hotel room he did not want the officers to find. (Suppression Hr'g Tr. at 30). Trooper Meyer responded, "What do you mean by stuff?" (Suppression Hr'g Tr. at 30). Petitioner then admitted that he was a heroin addict and that a substantial quantity of heroin and money were inside his hotel room. A search warrant was then obtained for petitioner's hotel room. The subsequent search revealed the drugs, money, and paraphernalia that form the basis of the criminal charges at issue.

### B. Procedural History

On October 11, 1996, an information was filed in the Sedgwick County, Kansas, Dis-

---

1. The record reveals Agent Brandau arrived back at the residence and assisted in arresting the suspect and petitioner. (Suppression Hr'g Tr. at 81–82). The court questions, as does petitioner, the utility of petitioner's fake arrest when the suspect apparently observed that petitioner's confidant was in fact a law enforcement officer.

2. The record is unclear as to whether petitioner was placed into a conventional interro-

gation room or a more benign space like a detective's office. In any event, the record demonstrates the room was small and petitioner was in the space by himself.

3. The marijuana was given to petitioner by the suspects in Agent Brandau's presence. However, according to Brandau, the existence of the scales and rolling papers was unknown to him. (Suppression Hr'g Tr. at 84).

trict Court charging petitioner with one count of possession of heroin with intent to sell, one count of possession of heroin, one count of possession of cocaine, and two counts of failing to have a proper drug tax stamp. A preliminary hearing was held on July 23, 1998. On September 11, 1998, petitioner filed a motion to suppress his inculpatory statements and all of the physical evidence at issue. Thereafter, on October 5, 1998, the state trial court held an evidentiary hearing on petitioner's motion. The following day, October 6, 1998, the trial court orally denied petitioner's motion. On October 21, 1998, the case proceeded to a bench trial. Pursuant to the parties' agreement, the trial court heard very brief testimony and based its findings primarily on the evidence presented at the preliminary hearing and evidentiary hearing. Petitioner was found guilty on all counts except the simple possession of heroin charge. On December 18, 1998, petitioner was sentenced to a controlling term of forty-one months imprisonment. Petitioner's motion for a new trial was subsequently denied by the trial court.

On March 24, 2000, the Kansas Court of Appeals ("KCOA") affirmed petitioner's convictions. *State v. Abraham,* No. 82,589 (Kan.App. Mar. 24, 2000) (unpublished opinion). On appeal, petitioner unsuccessfully raised the following claims:

Issue I: The trial court committed reversible error when it denied [petitioner's] Motion to Suppress all evidence and statements that were the product of, and flowed from, an illegal search and seizure of his automobile. In addition, all statements made by [petitioner] were elicited without the constitutional protection provided by *Miranda* warnings.

Issue II: There was insufficient evidence from which a rational factfinder could conclude that [petitioner] was guilty beyond a reasonable doubt of possession of heroin with the intent to sell.

Appellant's Brief at ii–iii, *State v. Abraham,* No. 82,589 (Kan.App. Mar. 24, 2000). The Kansas Supreme Court denied review on June 13, 2000. Thereafter, on September 22, 2000, petitioner filed the instant request for federal habeas relief.

## II. PETITIONER'S FEDERAL CLAIMS

In asserting he is entitled to federal habeas relief, petitioner levies the following claims:

Ground One: [Petitioner]'s conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

Ground Two: [Petitioner]'s conviction was obtained by a violation of the privilege against self-incrimination.

Ground Three: Insufficient evidence was presented by the prosecution that could prove that the mere possession of drugs [sic] were in fact possessed with the intent to sell.

(Pet'r Mem. in Support of Pet. at 13, 22, 31).

## III. STANDARD OF REVIEW

Under 28 U.S.C. § 2254,[4] a federal court is precluded from granting habeas relief on any claim adjudicated by a state court, unless the state court's proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determina-

---

**4.** Because petitioner filed his petition for habeas relief well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA applies to his

petition. *See generally Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

tion of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). *See Williams v. Taylor,* 529 U.S. 362, 405–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (construing the review standard in 28 U.S.C. § 2254).

▆▆▆ A state court's decision is "contrary to" an established federal law if the state court reaches a different result than the Supreme Court would when presented with facts that are "materially indistinguishable from a relevant Supreme Court precedent" or if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams,* 529 U.S. at 405, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established federal law if a "state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

Additionally, the Supreme Court has clearly dictated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Federal habeas actions do not provide relief for errors of state law. *Id.* (citing *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)).

## IV. DISCUSSION

### A. Search and Seizure

▆▆▆ Petitioner asserts that the search of his vehicle was unconstitutional and that the evidence obtained by the search should have been excluded as fruit of the illegal search. Petitioner raised this issue before the trial court in his motion to suppress, and the trial court held an extensive evidentiary hearing on the motion. The trial court concluded the officer had probable cause to search the vehicle based on his immediate awareness of the criminality of the items observed. (Tr. of Trial Court's Rulings at 4). The KCOA agreed. Relying on the plain-view doctrine, the KCOA found the officer "had a reasonable basis for believing the ZigZag rolling papers in the jeep in front of the house were drug paraphernalia." *Abraham.* Petitioner now alleges this finding is contrary to Supreme Court precedent.

Unfortunately for petitioner, the court's review of state court determinations regarding the suppression of evidence pursuant to the Fourth Amendment is severely circumscribed. In *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment Claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *See also Cannon v. Gibson,* 259 F.3d 1253, 1260 (10th Cir. 2001) (applying *Stone* in affirming district court's finding it was barred from considering a state prisoner's federal habeas claim); *Herrera v. Lemaster,* 225 F.3d 1176, 1178 n. 2 (10th Cir.2000) (finding enactment of the AEDPA did not alter *Stone's* holding); *Allen v. Hannigan,* 93 F.Supp.2d 1149, 1151 (D.Kan.2000) (applying *Stone* ).

The record in this case clearly reveals petitioner had a "full and fair" opportunity to litigate this issue before the state courts. Both the trial court and KCOA identified the relevant standards and applied them to the facts at hand. *Cf. Herrera,* 225 F.3d at 1178 (finding petitioner did not receive full and fair consideration when state court failed to apply the correct legal standard). Therefore, the court is compelled by *Stone* to find that no relief is

available under § 2254. The petition shall be denied as to this issue.

## B. *Miranda* Violation

█ Petitioner next argues his Fifth Amendment privilege against self-incrimination was violated. In particular, petitioner asserts his statements given to Trooper Meyer should have been excluded due to the officers' failure to inform petitioner of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the Supreme Court held that an individual questioned by law enforcement officers "after being taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. 1602. Failure to give the warnings generally results in the statements being excluded. *Id.* at 492, 86 S.Ct. 1602. *But see Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The warnings must be given, therefore, when the individual is (1) in custody and (2) being interrogated. The record clearly reveals no warnings were given to petitioner prior to his making the incriminating statements at issue.

In denying petitioner's motion to suppress the statements, the state trial court determined petitioner was not "in custody" for purposes of *Miranda*. The trial court's finding was premised primarily on the fact that petitioner's arrest was effectuated merely to disguise petitioner's participation in the sting operation. In fact, it appears it was petitioner, not the officers, who insisted on the arrest charade. Affirming the trial court, the KCOA opined:

[Petitioner] requested to be arrested at the scene to protect him from being detected as an informant. Clearly, [petitioner] was not detained or confined in the traditional sense when questioned by Officers Bradley and Meyers. The questioning did not occur in a coercive setting. The questioning of [petitioner] was instituted by the officers to determine if he had possibly compromised their investigation.

Further, the questioning of [petitioner] appears to have been brief. Nothing indicates either Officer Bradley or Meyers intimidated [petitioner] in any way. At that time, [petitioner] was not a target of law enforcement. Rather, [petitioner] requested to speak with Meyers and initiated the conversation with Meyers. While Meyers did ask what [petitioner] meant by "stuff," such an open-ended question was not the type of interrogation which requires *Miranda* warnings. No measure of compulsion was implicated.

The record contains evidence to support the trial court's finding that [petitioner] was not in custody, not interrogated, and, thus, not entitled to a *Miranda* warning.

*Abraham*, No. 82,589 at 4–5 (internal citation omitted).

In reaching its conclusions, the KCOA correctly identified *Miranda* and its progeny as the controlling legal standard. Under the AEDPA, therefore, the court may grant relief on this issue only if the court concludes the KCOA unreasonably applied the standard to the pertinent facts. *Williams*, 529 U.S. at 405, 120 S.Ct. 1495.

### 1. Custodial

█ An individual is "in custody" for purposes of *Miranda* if he "has been deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444,

86 S.Ct. 1602, or his freedom of action has been curtailed to a "degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). A show "of official authority such that a reasonable person would not have believed he was free to leave" indicates that an arrest has occurred. *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (internal citation and quotation marks omitted). The subjective intent of either the officers or the suspect are not relevant in determining whether an individual is in custody. *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

■ This case represents an unique set of facts, for petitioner's arrest and transportation to the Sheriff's Department was merely a charade employed to fool the other suspects. A reasonable person in petitioner's position would have known his initial confinement was voluntary. While petitioner was placed inside a room by himself, the record reveals this isolation was done only in an effort to give credibility to the ruse.[5]

When the drugs and paraphernalia were subsequently discovered in petitioner's vehicle, however, the consensual nature of petitioner's presence became muddied. At the suppression hearing, Brandau testified that petitioner was free to leave at any time before, during, or after the officers spoke to petitioner about the seized items. (Suppression Hr'g Tr. at 92) ("If he had asked to leave, he would have been free to walk out the door, is that your belief? Yeah, we—he was there 'cause he wanted to be there.' "). While Brandau was the agent in charge of the investigation and present at the Sheriff's Department, there is no indication in the record that he conveyed his beliefs to petitioner, so the court gives little weight to his undisclosed ideas regarding petitioner's custody status. *Feltrop v. Bowersox,* 91 F.3d 1178, 1181 (8th Cir.1996) ("the subjective *undisclosed* beliefs of [the suspect] and the questioning officers regarding custody are irrelevant") (emphasis in original) (citing *Stansbury,* 511 U.S. at 323–24, 114 S.Ct. 1526).

On the other hand, Trooper Meyer, who did converse with petitioner, testified regarding this issue as follows:

Question: Okay. And did he make a request to be allowed to go?

Answer: No.

Question: Not to you?

Answer: Not—well, after the discovery of the items, yes.

Question: Okay. After the discovery of the items in his vehicle, he asked to be released, is that—

Answer: Right.

Question: Okay. And he was told no, you can't go, right?

Answer: I believe that's right.

Question: Okay. And then—

The Court: Excuse me.

Attorney: Yes, Your Honor.

The Court: Point of clarification. Was that request made to Trooper Meyer?

---

**5.** Although not fully explained by the parties, it appears the three suspects caught in the operation were being processed in an area of the Sheriff's Department near the room petitioner was occupying.

Question: The request for [petitioner] to leave, did he make that request to you, to your memory?

Answer: I believe. I don't know that it was a request as much as it was, I don't understand why you can't just let me go.

Question: Okay. And you or Agent Bradley responded to him, we can't let you go because we have to make sure you're clean, something to that effect?

Answer: Yes.

(Suppression Hr'g Tr. at 36–37).

Furthermore, at petitioner's preliminary hearing, Trooper Meyer's testimony followed a similar vein:

Question: Okay. Was he free to leave?

Answer: Well, prior to discovery of the items in the vehicle, yes.

Question: In other words, the items in the vehicle were discovered at the time of the arrest on site, correct?

Answer: No. The items discovered in the vehicle were found at some point after I had left the scene to transport [petitioner] to the Sheriff's Office per his request.

Question: Okay. But by the time you got over there and talked with Bradley and Brandau you all were talking about the stuff that was found in his vehicle; correct?

Answer: That is correct.

Question: So at that point he wasn't free to leave; correct?

Answer: That is a safe assumption.

(Preliminary Hr'g Tr. at 22–23).

Trooper Meyer reaffirmed his view of the situation at the suppression hearing:

Question: Okay. Now, you said before you went in to speak with [petitioner]

that you had received information that something like marijuana and a set of scales were found in his vehicle, is that correct?

Answer: Yes.

Question: And when you got that information, was [petitioner] free to leave?

Answer: I don't believe so.

(Suppression Hr'g Tr. at 35).[6]

Based on the record before it, the court seriously doubts a reasonable person in petitioner's position would have felt free to leave the confines of the interrogation room. Most striking is Trooper Meyer's account of petitioner's query regarding his ability to leave. Although it is true no officer said verbatim that petitioner could not leave, a negative response to petitioner's question of why he was unable to leave strikes an equivalent chord with the court. It is clear Trooper Meyer interpreted the question as essentially a request to leave. The unequivocal response from the officers was that petitioner could *not* leave. The freedom of the suspect to end the interview at-will and leave the premises has always been the touchstone of the "in custody" analysis. *See, e.g., United States v. Ellison,* 791 F.2d 821, 823 (10th Cir.1986) (Saffels, J.,) (finding an interview non-custodial due primarily to the suspect's freedom to leave).

■ Furthermore, the KCOA appears to have misapplied a central factor in the *Miranda* analysis. The Supreme Court has long held that a questioning officer's undisclosed subjective suspicions regarding a suspect are irrelevant to the "in custody" analysis. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[a] policeman's

6. The court finds Trooper Meyer's belief, as compared to Agent Brandau's, regarding petitioner's custodial status relevant because, as

will be discussed, Trooper Meyer disclosed his belief to petitioner.

unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) ("Nor is the requirement of warnings to be imposed simply because ... the questioned person is one whom the police suspect."). The obvious corollary of this rule is that an officer's lack of undisclosed suspicion is also irrelevant. The truth of this statement was succinctly laid out by the Supreme Court in *Stansbury:*

> It is well settled, then, that police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda. The same principle obtains if an officer's undisclosed assessment is that the person being questioned is not a suspect.* Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry.

511 U.S. at 324, 114 S.Ct. 1526 (emphasis added).

Contrary to this precedent, the KCOA relies on a perceived lack of suspicion by the questioning officers for buoying its conclusion that petitioner was not "in custody." In particular, the KCOA's opinion states: "The questioning of [petitioner] was instituted by the officers to determine if he had possibly compromised their investigation.... At that time, [petitioner] was not a target of law enforcement." *Abraham*, No. 82,589 at 4. In light of the teachings of *Stansbury* quoted above, the import of these facts is lost on the court.

■ Unfortunately, the KCOA's opinion diverges from the proper analytical line even further. While a questioning officer's undisclosed suspicions or motivations are irrelevant, disclosed suspicions, while not determinative, are an important factor for gauging whether a reasonable person should have felt free to leave. Once again, the Court in *Stansbury* stated:

> The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature or an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether the individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

511 U.S. at 325, 114 S.Ct. 1526.

In this case, according to Trooper Meyer's testimony, petitioner was in fact informed that the officers were suspicious of him and suspected he might be dealing narcotics. In their words, they had to ensure petitioner was "clean." In fact, their articulated and disclosed suspicion was the very reason petitioner was not free to leave. *See Berkemer*, 468 U.S. at 437–38, 104 S.Ct. 3138 ("In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek."). It seems highly reasonable that a person in petitioner's position would feel he was not leaving the interrogation room until the officers' suspicions were quelled.

Continuing on, the court finds troubling another observation made by the KCOA. Without elaboration or explanation, the opinion states the interrogation did not occur in a coercive setting. *Abraham,* No. 82, 589 at 4. To be sure, in judging whether a reasonable person would have felt free to leave, the court is allowed to consider the totality of the circumstances surrounding the individual's encounter with the police. In this case, petitioner was inside an interrogation room being asked questions by two law enforcement officers. The court cannot concur with the KCOA that such a setting is blatantly non-coercive. *See Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138 (noting an encounter is more likely custodial if it is "police dominated"). In fact, this setting exemplifies the type of inherently compulsive scenario *Miranda* was meant to cover. *See Beckwith v. United States,* 425 U.S. 341, 345–46, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (noting that in *Miranda* the "Court concluded that compulsion is 'inherent in custodial surrounding' ") (quoting *Miranda,* 384 U.S. at 439, 86 S.Ct. 1602).

 In light of the above analysis, the court finds the KCOA's conclusion that petitioner was not "in custody" to be an unreasonable[7] decision pursuant to *Mi-*

*randa* and its progeny.[8] While it may be true petitioner's initial confinement was consensual, his status unquestionably changed when he was denied his ability to cease the interview, stand-up, and walk out of the station. *See Bains v. Cambra,* 204 F.3d 964, 972 (9th Cir.2000) ("An individual is 'in custody' at the point a reasonable person would feel that he was not free to terminate the interrogation."). In sum, a reasonable person, told by two officers that he is not free to leave an interrogation room until he answers questions about allegedly illegal activity or consents to a search, would believe he was in the "functional equivalent of formal arrest." *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138.

Since the court will need to address the "interrogation" phase of the *Miranda* analysis, it becomes critical to identify with particularity the point at which petitioner's presence in the interrogation room changed from consensual to custodial. As the above analysis makes clear, the court's finding was persuaded heavily by the officers' direct denial of petitioner's request to leave. Up to that point, it does appear a reasonable person would have still considered his confinement voluntary. Therefore, petitioner's initial discussion with Agent Bradley did not occur while petitioner was "in custody." However, after

7. The KCOA's opinion satisfies the AEDPA's "unreasonable application" standard primarily because it completely fails to take into consideration the officers' direct and verbal denial of petitioner's request to leave the interrogation room. The court not only disagrees with the KCOA's final conclusion, but, the appellate court's refusal to examine the lynchpin of the "in custody" analysis renders its holding unreasonable.

8. Although the AEDPA requires a federal habeas court to grant a state court's finding of fact deference, 28 U.S.C. § 2254(e)(1), the Supreme Court has established that the "in custody" inquiry is a mixed question of law and fact. *Thompson v. Keohane,* 516 U.S. 99, 114–15, 116 S.Ct. 457, 133 L.Ed.2d 383

(1995) ("We thus conclude that once the historical facts are resolved, the state court is not 'in an appreciably better position than the federal habeas court to make [the ultimate] determination' of the consistency of the law enforcement officer's conduct with the federal *Miranda* warning requirement.") (quoting *Miller v. Fenton,* 474 U.S. 104, 117, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)) (alteration in original). *See Bains v. Cambra,* 204 F.3d 964, 972 (9th Cir.2000) (applying the pre-AEDPA teachings of *Thompson* in a case controlled by the AEDPA). Therefore, the court may, after finding the state court's decision was unreasonable, grant relief pursuant to 28 U.S.C. § 2254(d)(1).

Trooper Meyer entered the room and petitioner presented his query, petitioner was "in custody" for purposes of *Miranda*.

## 2. Interrogation

Although the state trial court did not continue its analysis into the interrogation phase of *Miranda*, the KCOA clearly found petitioner was not interrogated. *Abraham*, No. 82,589 at 5. Applying the same standard of review as above, the court now turns to address this issue.

 The test to determine whether questioning is "interrogation" within the meaning of *Miranda* is whether under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Not all statements obtained by the police, however, are to be considered the product of interrogation. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *Id.* at 299–300, 100 S.Ct. 1682. The police must do more than listen: "the defendant must demonstrate that the police … took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Interrogation, as conceptualized in *Miranda*, must, therefore, reflect a measure of compulsion above and beyond that inherent in custody itself. *Innis*, 446 U.S. at 300, 100 S.Ct. 1682.

 As discussed above, the court will consider only those events transpiring after petitioner was "in custody" for determining whether he was interrogated. First, as to petitioner's statement that he had "stuff" in his room he did not want the police to find, the court finds such statement was not the product of interrogation.

The record reveals petitioner purposefully called Trooper Meyer back into the interrogation room in order to volunteer the information. Volunteered statements, which are not the product of compulsive questions or statements do not offend the teachings of *Miranda*. Furthermore, the only question asked by the officers immediately preceding petitioner's statement was a request for consent to search. An officer's request for consent, however, has long been held not to be reasonably likely to elicit an incriminating response. *See, e.g., United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir.1994) ("An officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's *Miranda* rights."). Therefore, under either rationale, the statement was not uttered as a result of the officers' interrogation.

 Petitioner's second statement, however, raises serious issues as to its admissibility. The KCOA concluded Trooper Meyer's question regarding the meaning of "stuff," was "not the type of interrogation which requires *Miranda* warnings." *Abraham*, No. 82,589 at 5. According to the state appellate court, the question was not "interrogation" because it was "open-ended." *Id.*

In assessing whether Trooper Meyer's question was interrogation, the court must remain focused on the singular issue before it, namely was the question reasonably likely to elicit an incriminating response. While the KCOA appears to have been swayed by the structure of the question, this court's analysis must be dominated by the context in which the question was uttered. Unlike an officer asking where contraband is located or why a suspect acted criminally, the question at hand in this case did not directly implicate criminal behavior. However, the facially innoc-

uous character of the question drops away in light of the circumstances in which it was posed.

In *United States v. Perdue*, 8 F.3d 1455, 1465 (10th Cir.1993), *rev'g* 1992 WL 132498 (D.Kan.1992) (Saffels, J.), the defendant challenged the admissibility of his statements given to police during his detention. One issue before the Tenth Circuit was whether the officers' questioning of the defendant amounted to interrogation for purposes of *Miranda*. *Id.* at 1465. In deciding the issue, the Tenth Circuit stated:

> Given the fact that [the defendant] was entering a piece of property that was primarily used to grow marijuana, the initial question, "What are you doing here?," was reasonably likely to illicit [sic] an incriminating response. When [the defendant] answered, "To check on my stuff," the questions that immediately followed, "What stuff?," and "Who does the marijuana belong to?" are the essence of interrogation. Therefore, the officers should have informed [the defendant] of his constitutional rights after "neutralizing" him but before commencing with the interrogation. Their failure to do so constitutes a violation of *Miranda*.

*Id.*

Clearly, the *Perdue* court's holding was premised not on the open-ended or facially benign nature of the questions, but, rather, the circuit court was swayed by the questions' likelihood of triggering an incriminating response in light of their context. *See also United States v. Bentley*, No. 93–50457, 1994 WL 408236, at *4 (9th Cir. Aug.4, 1994) (holding question, "What is a twist?," was likely to elicit an incriminating response because of the criminal context in which it was uttered even though the interrogating officer did not know the meaning of the term "twist"). *But see United States v. LaPierre*, 998 F.2d 1460, 1467 (9th Cir.1993) (finding question, "What do you mean [by stuff]?," not to be interrogation but rather "polite attempts to have [the defendant] clarify what to [the officer] must have seemed to be somewhat incoherent rambling").

In the case at bar, Trooper Meyer was informed by petitioner that petitioner would not consent to a search of his hotel room because he had "stuff" in the room he did not want the officers to find. The only reasonable implication of this statement was that petitioner had some form of contraband concealed inside his room. Although Trooper Meyer testified he "had no idea what [petitioner] meant by stuff," (Suppression Hr'g Tr. at 41), the subject matter was clearly criminal in nature. Trooper Meyer's question cannot be brushed away as merely a clarification of an incoherent statement. Rather, the question was aimed at identifying what type of contraband petitioner had hidden inside his hotel room. Trooper Meyer was simply continuing his investigation into petitioner's conduct in order to ensure he was "clean." Viewed in its proper context, the question, "What do you mean by stuff?," was reasonably likely to, and in fact did, elicit an incriminating response.

In light of the above analysis, the court, concludes the KCOA's decision that petitioner was not interrogated was an unreasonable application of *Miranda* and its progeny. The state court's apparent belief that "open-ended" questions categorically fall outside the scope of interrogation coupled with its failure to consider the context in which the question was posed lead to its unreasonable holding. Therefore, the court finds that the KCOA's determination under both prongs of *Miranda* was unreasonable. Whether the court should issue the writ, however, will be considered below.

### 3. Harmless Error

▮▮▮▮ In *Dickerson v. United States,* 530 U.S. 428, 438, 445, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Court reemphasized the importance of *Miranda* by holding it was a "constitutional decision," which Congress could not legislatively supercede. Under *Dickerson,* the admission of a statement gathered in violation of *Miranda,* standing alone, is sufficient to demonstrate a trial error of constitutional magnitude. Merely demonstrating a constitutional error, however, does not automatically entitle a habeas petitioner to relief. Trial evidentiary errors, including even the admission of statements that violated a defendant's Fifth and Fourteenth Amendment rights, are subject to collateral review under the harmless error standard set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In applying the standard, the court must consider whether the error had a " 'substantial and injurious effect or influence' " on the outcome. *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). To make such a showing, the habeas petitioner must establish that the error "resulted in actual prejudice." *Id.* Although the standard set forth in *Brecht* arose in the context of a jury trial, the standard is equally applicable in a case tried to the bench. *See generally Beets v. Iowa Dep't of Corr. Servs.,* 164 F.3d 1131, 1136 (8th Cir.1999) (applying harmless error analysis on habeas review of bench trial).

▮▮▮▮ In the case at bar, the court finds the admission of petitioner's inculpatory statements failed to substantially impact the trial court's determination of guilt. During the bench trial, the trial court admitted into evidence the narcotics and cash seized from petitioner's hotel room. (Bench Trial Tr. at 3–5). In light of such evidence, the significance of petitioner's statements admitting to such possession was significantly reduced. Because petitioner's inadmissible statements were not essential to establishing his guilt, any resulting error was harmless. As such, all relief will be denied as to this issue.

▮▮▮▮ Although not fully fleshed out by the parties,[9] the above analysis raises a distinct question regarding the admission of the physical evidence. The record demonstrates the officers incorporated petitioners' unwarned confession into their request for a warrant to search petitioner's hotel room. Under the teachings of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), derivative evidence flowing from a constitutional violation is generally inadmissible under the fruit of the poisonous tree doctrine. It has long been understood that derivative evidence generated by a non-coercive interview, which nevertheless technically violated *Miranda,* does not automatically fall within the purview of the fruits doctrine. *See United States v. McCurdy,* 40 F.3d 1111, 1116–17 (10th Cir.1994) (citing *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). *See also Patterson v. United States,* 485 U.S. 922, 922–23, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988) ("In *Michigan v. Tucker,* this Court expressly left open

---

**9.** Within his papers, petitioner argues: "But for the statements, the search of the motel would not have occurred. But for the search of the motel room, the drugs would not have been found. And but for the finding of the drugs, [petitioner] would not have been charged." (Pet'r Mem. in Support of Pet. at 31). The court construes petitioner's papers as advancing the argument that the state courts erred in not suppressing the physical, derivative evidence.

the question of the admissibility of physical evidence obtained as a result of an interrogation conducted contrary to *Miranda*.") (White, J., dissenting from the denial of cert.). Generally speaking, it was argued that because the fruits analysis serves to suppress evidence generated at the cost of an individual's constitutional right, and because *Miranda* served merely as a prophylactic and not as a right in and of itself, a violation of the rule did not rise to a level warranting suppression of all derivative evidence. *See United States v. Elie,* 111 F.3d 1135, 1142 (4th Cir.1997) ("*Wong Sun* and its 'fruit of the poisonous tree' analysis is inapplicable in cases involving mere departures from *Miranda*."); *United States v. Singleton,* 922 F.Supp. 1522, 1530 (D.Kan.1996) ("Because *Miranda* procedural violations are only presumptively coercive but not actually coercive, they do not trigger the 'fruit of the poisonous tree' doctrine or the 'cat out of the bag' analogy.") (internal citation omitted).

Although the Court's holding in *Dickerson* seems to have altered this general rule, the prevailing interpretation is that the Court retained the distinction, and the accompanying remedies, for violations of the Fourth Amendment, for which *Wong Sun* is particularly applicable, as compared to the Fifth Amendment, which, as *Elstad* and *Tucker* demonstrate, do not necessitate a fruits analysis. *See, e.g., United States v. Faulkingham,* 295 F.3d 85, 93 (1st Cir.2002) (published opinion) ("The various differences in purpose behind the Fourth and Fifth Amendments, articulated in *Elstad,* continue unchanged by *Dicker-*

*son,* and those differences affect the remedial options appropriate for violations of the two distinct constitutional amendments, and, more specifically, for violations of the *Miranda* rule."); *United States v. Sterling,* 283 F.3d 216, 219 (4th Cir.2002) ("Thus, the distinction between statements and derivative evidence survives *Dickerson*."); *United States v. DeSumma,* 272 F.3d 176, 180 (3rd Cir.2001) ("Ultimately, the Fifth Amendment prevents the use of the non-*Mirandized* statement rather than the introduction of derivative evidence."). *But see United States v. Morris,* No. 00–5255, 2002 WL 1365556, at *4 n. 5 (10th Cir. June 25, 2002) (unpublished opinion) (casting doubt on the viability of *Elstad* in light of *Dickerson* ).

■ The court addresses this matter because to the extent petitioner is arguing the state courts' decision not to suppress the physical evidence was an unreasonable application of federal law, the court rejects petitioner's assertion.[10] The record clearly demonstrates petitioner's confession, while technically in violation of *Miranda,* was voluntary.

### C. Sufficiency of the Evidence

As a federal habeas court reviewing the sufficiency of the evidence presented against a state prisoner, the appropriate inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Romano v. Gibson,* 239 F.3d 1156, 1164 (10th Cir.2001) (emphasis in original) (quoting

10. The court acknowledges the utility of its discussion of *Dickerson* in this regard may be questionable in light of the AEDPA's restriction that relief be granted only if the state court reached a decision, which was "an unreasonable application of, *clearly established* Federal law...." 28 U.S.C. § 2254(d)(1) (emphasis added). *See Williams,* 529 U.S. at 412,

120 S.Ct. 1495 (holding that the phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of this Court's decisions *as of the time of the relevant state-court decision*") (emphasis added). Clearly before, and arguably after, *Dickerson,* no Supreme Court holding mandated a fruits analysis for technical violations of *Miranda.*

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). *See also Valdez v. Ward*, 219 F.3d 1222, 1237 (10th Cir.2000) (construing sufficiency of the evidence claim under the AEDPA).[11]

 Petitioner asserts the evidence produced at trial was insufficient to convict him of possession of heroin with the intent to sell. The court disagrees. The record reveals law enforcement officers seized 4.19 grams of heroin, 1.35 grams of cocaine, and approximately $10,000 in cash from petitioner's hotel room. Agent Brandau testified, according to his training and experience, that the amount of narcotics discovered in the room when combined with the large amount of cash, demonstrated the narcotics were possessed for resale purposes. (Preliminary Hr'g Tr. at 53). Although petitioner testified the drugs were for personal use, (Bench Trial Tr. at 16–17), the court must presume the trial court resolved this conflict in favor of the prosecution. *See Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). Based on the record before it, the court concludes there was sufficient evidence produced demonstrating petitioner's intent to sell the seized narcotics. All relief will be denied as to this issue.

## VI. CONCLUSION

As to petitioner's first claim, the court declined to reach the claim's merits on procedural grounds. Although the court found petitioner's second claim to be meritorious, application of the harmless error standard prevented the court from granting the writ. Finally, the court found petitioner's third claim lacking in merit. For these reasons, all relief shall be denied.

**IT IS THEREFORE BY THIS COURT ORDERED** that the Petition for a Writ of Habeas Corpus (Doc. 1) filed pursuant to 28 U.S.C. § 2254 is denied.

---

11. As the Tenth Circuit recently pointed out, whether claims of the type should be reviewed as a legal question or as a factual question under the AEDPA is uncertain in this circuit. *Fields v. Gibson*, 277 F.3d 1203, 1221 (10th Cir.2002) (noting legal determinations are controlled by 28 U.S.C. § 2254(d)(1) while factual determinations are controlled by § 2254(d)(2)). In the case at bar, however, this uncertainty is moot, for under either standard petitioner's claim is clearly lacking in merit. *Id.* ("We have held, however, that it is possible to avoid deciding what standard of review applies when the petitioner's claims are clearly meritless under either standard.").