John C. KNUCKLES, Sr.,
Petitioner–Appellant,

v.

Anthony BRIGANO, Warden,
Respondent–Appellee.

No. 01–3425.

United States Court of Appeals,
Sixth Circuit.

July 22, 2003.

Before CLAY and ROGERS, Circuit Judges; and COFFMAN, District Judge.*

CLAY, Circuit Judge.

Petitioner, John C. Knuckles, an Ohio prisoner proceeding *pro se*, appeals from an order denying habeas corpus relief pursuant to 28 U.S.C. § 2254, following Petitioner's conviction on one count of aggravated murder, as defined in Ohio Rev.Code § 2903.01(b) with specifications, one count of aggravated robbery as defined in Ohio Rev.Code § 2911.01(A)(1) with a specifica-

* The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and

tion, one count of tampering with evidence in violation of Ohio Rev.Code § 2921.12(A)(1), and one count of drug abuse in violation of Ohio Rev.Code § 2925.11(A). We AFFIRM the district court's order.

## FACTS

Bobby Bennett's body was found on the floor of his living room in Hamilton, Ohio at approximately 1:00 p.m. on January 30, 1989. When discovered, Bennett wore a light windbreaker and held keys in his right hand. The victim's wallet remained in his right rear pocket, but contained no cash.

The coroner determined that Bennett died between 10:00 a.m. and noon on January 30, 1989. The victim was killed by gunshot wounds to the back and side of the head, inflicted at close range by a .25 caliber weapon. The coroner removed two .25 caliber bullets from the victim's head and investigators located two "Federal" brand .25 caliber cartridge casings from Bennett's living room floor.

On the morning of January 30, 1989, Bennett had breakfast at a local donut shop. He paid for his $3.34 meal with a $20 bill, thus receiving $16 in paper currency. Bennett left the restaurant shortly before 11:00 a.m.

After departing the restaurant, Bennett drove to Fackey's Service Station. Charles Fackey, the owner, knew Bennett, who patronized the station regularly for at least twenty-five years. As Fackey pumped gas into Bennett's car, he saw a dark blue 1983 Renault Alliance approaching quickly. The Alliance slowed down and entered the gas station. The drive, later identified by Fackey as Petitioner, opened his door and leaned out of the car.

Western Districts of Kentucky, sitting by designation.

Bennett told Petitioner to meet him at Bennett's home. Petitioner then backed out of the station and headed north, toward Bennett's residence. Fackey finished filling Bennett's tank and charged the $16 worth of gasoline to Bennett's account.

Petitioner knew the victim well because Bennett was once married to Petitioner's sister. The relationship between Petitioner and Bennett became increasingly strained because Petitioner developed a drug addiction that he supported by constantly borrowing money from Bennett. The day before his murder, Bennett phoned his daughter in Germany and informed her that he would not loan Petitioner any more money because Petitioner would only use the money for drugs. On Friday, January 27, Bennett cashed his payroll check and received $290. Testimony at trial revealed that the victim habitually carried cash in his wallet.

At approximately 9:30 a.m. on January 30, 1989 Petitioner phoned his sister, Juanita Scenters, and asked to borrow a .25 caliber Raven automatic pistol from her ex-husband. Petitioner arrived at Wesley Scenters' residence at about 10:00 a.m. The Raven was new and had never been fired. Petitioner took the gun loaded with six rounds from a new box of Federal Brand ammunition that contained twenty-five cartridges.

After the murder, Hamilton police began looking for Petitioner because he was Bennett's former brother-in-law and he drove a blue Renault Alliance. Police also wanted Petitioner on several outstanding warrants for passing bad checks. Authorities located Petitioner that evening.

After reading him his *Miranda* rights, Petitioner requested an attorney. His interrogators then stated, "[w]e wanted to talk to you about Bobby Bennett." *State v. Knuckles (Knuckles II)*, No. CA93–11–222, 1995 WL 22713, at *2 (Ohio Ct.App.

Jan. 23, 1995). Petitioner replied that he thought the police wanted to talk with him about the bad checks, but that he would discuss Bennett's death. In fact, Petitioner suggested that he had his own theories as to who killed Bennett, and then signed a statement waiving his rights. He spoke to the police for two hours and made incriminating statements that helped police locate the Raven.

When a detective entered the room to perform an atomic absorption test, Petitioner told police they would find gunpowder residue on his hands because he test fired the borrowed Raven outside his home. Pursuant to a search warrant, police located the Raven in the trunk of Petitioner's car. When Petitioner saw the gun on a desk in the police station, he remarked, "If that gun killed Bobby Bennett, you have got your man.... I have had the gun. I have had control of it.... [But] the gun will not match. It's not the gun." *Id.* Police also recovered a twenty-five count box of Federal brand ammunition, which contained sixteen rounds of .25 caliber bullets. The officers searching Petitioner's home found seven Federal brand .25 caliber cartridge casings on the ground and one .25 caliber Federal brand bullet.

According to ballistics analysis on the handgun itself, the spent casings, and the bullets recovered from the victim's body, someone had attempted to deliberately alter the gun's breech face, firing pin, and barrel. Petitioner had extensive familiarity with firearms. He bought and sold guns, went to gun shows, hunted, participated in target shooting, and even had a small room in his home where he worked on firearms and ammunition. The modifications to the Raven precluded any conclusive finding that the gun fired the bullets removed from Bennett's body. Ballistics experts could still determine, however, that the same gun fired the bullets re-

moved from the victim and the bullet recovered from Petitioner's yard.

With this information, a Butler County grand jury indicted Petitioner on one count of aggravated murder with specifications, one count of aggravated robbery with a specification, one count of tampering with evidence, and one count of drug abuse. A jury found Petitioner guilty on all counts, but the Ohio Supreme Court reversed the conviction, holding that police had impermissibly elicited incriminating statements after Petitioner requested an attorney. *See State v. Knuckles (Knuckles I)*, 65 Ohio St.3d 494, 605 N.E.2d 54 (1992).

On retrial, Petitioner was convicted on the first three counts and pleaded *nolo contendere* to the drug charge. On October 29, 1993, the court sentenced Petitioner to consecutive terms of life imprisonment with eligibility for parole after twenty years for the murder, three years for aggravated robbery, two years for tampering with evidence, and a concurrent term of one year for the drug charge. On appeal, Petitioner raised four issues:

> First Assignment of Error: The trial court erred to the prejudice of defendant-appellant when it refused to suppress the fruits of a search obtained in violation of appellant's Fifth Amendment rights.
> Second Assignment of Error: The trial court erred to the prejudice of defendant-appellant when it refused to declare a mistrial after the outburst of a spectator.
> Third Assignment of Error: The trial court erred to the prejudice of the defendant-appellant when it refused to dismiss the aggravated robbery specification and the count of aggravated robbery.
> Fourth Assignment of Error: The trial court erred to the prejudice of defendant-appellant when it did not instruct

the jury on the lesser-included offense of involuntary manslaughter.

The Ohio Court of Appeals affirmed on January 23, 1995. *See Knuckles II*, 1995 WL 22713.

Petitioner then appealed to the Ohio Supreme Court, arguing only one of the four issues originally raised to the Ohio Court of Appeals—whether the trial court should have suppressed physical evidence derived from the improper interrogation. On June 14, 1995, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. The Supreme Court denied *certiorari* on November 6, 1995. *See Knuckles (Knuckles III) v. Ohio*, 516 U.S. 965, 116 S.Ct. 421, 133 L.Ed.2d 338 (1995).

On February 7, 1996, Petitioner filed a petition for post-conviction relief in the Butler County Court of Common Pleas. Petitioner argued, for the first time, that Ohio violated his due process rights by refusing to make evidence available to him for independent testing. On March 4, 1996, the trial court found Petitioner's claim barred by *res judicata*. The Ohio Court of Appeals affirmed. *See State v. Knuckles (Knuckles IV)*, No. CA96–05–106, slip op. (Ohio Ct.App. Sept. 16, 1996).

On April 17, 1996, Petitioner filed a second post-conviction petition, this time making four new claims:

> First Assignment of Error: Defendant/petitioner, was denied his 14th Amendment rights to due process and his 6th Amendment rights to a fair-trial, by and through the Constitution of the United States and by Section 10, Article I, of the Constitution of the State of Ohio, when the prosecution's acts and misconduct failed to protect the rights of the accused.
> Second Assignment of Error: Defendant/petitioner, was denied a fair-trial as he was denied effective assistance of

counsel, violating his Sixth Amendment rights by failing to properly follow through with the pre-trial motions, compromising the elements of a fair trial. Third Assignment of Error: Defendant/petitioner, was denied a fair trial through the bias and partiality procedures of the trial judge, which prejudiced and deprived the accused of a "fair-trial" in his failure to protect the accused's rights, guaranteed by and through the Constitution of the United States and the Constitution of the State of Ohio.

Fourth Assignment of Error: Defendant/petitioner was denied a fair-trial as to the cumulative effect of the above errors which prejudiced the petitioner and deprived him of a fair trial, as he is guaranteed by the Constitution of the United States and the Constitution of the State of Ohio.

The trial court again denied relief, as did the Ohio Court of Appeals. On June 14.1996. the Ohio Supreme Court denied leave for further appeal.

On July 31, 1998, Petitioner applied to the Ohio Court of Appeals for a delayed re-opening of his appeal on the basis of ineffective assistance of appellate counsel. He made two claims:

First Error of Deficiency: Appellate counsel failed to present trial court error; when the court refused to suppress evidence destroyed and/or altered by the police officers and prosecution....

Second Error of Deficiency: Appellate counsel failed to present trial errors created by and through the inadequacies of trial counsel wherein: the cumulative effect of all the foregoing errors committed throughout the trial proceedings, which prejudiced the outcome thereof.

On September 16, 1998, the Ohio Court of Appeals denied Petitioner's application as untimely. Petitioner appealed to the Ohio Supreme Court, which dismissed his appeal on December 9, 1998.

Petitioner filed his habeas corpus petition on May 11, 1999, in United States District Court. Petitioner raised the following grounds for relief:

Ground One: the Petitioner's Fifth Amendment Right Against Self-incrimination Was Violated When the Trial Court Allowed Evidence Obtained as a Result of Statements Made in Response to an Illegal Interrogation to Be Admitted at Trial.

Ground Two: the Trial Court Erred in Refusing to Grant a Misstrial [Sic] after a Spectator's Outbursts During the Trial Resulted in Prejudice to the Petitioner, Disruption of the Trial and Undermined the Presumption of Petitioner's Innocence, Resulting in a Violation of Petitioner's Fifth and Fourteenth Amendment Rights to a Fair Trial and Due Process of Law.

Ground Three: the Trial Court's Denial of Petitioner's Motion for Acquittal, When the State Failed to Present Sufficient Credible Evidence to Support a Conviction for Aggravated Robbery and the Aggravated Robbery Specification, Resulted in the Denial of Petitioner's Fourteenth Amendment Right to Due Process of Law.

Ground Four: the Trial Court Erred in Failing to Instruct the Jury on the Lesser-included Offense of Involuntary Manslaughter. Where the Petitioner Is Charged with Aggravated Murder but Did Not Act Purposely in the Commission of the Offense, the Trial Court Committed Plain Error in Not Instructing the Jury on the Lesser Charge.

Ground Five: Petitioner Was Prejudiced When the Trial Court Allowed Crucial Exculpatory Evidence, That Had Been Destroyed/altered During Testing by the State Without Properly Notifying

Petitioner or His Counsel, to Be Admitted at Trial Thus Denying Petitioner's Right to a Fair Trial and Due Process of Law.

Ground Six: Petitioner's Trial Attorney Neglected to Follow up on Pretrial Motions and Failed to Present and [Sic] Adequate Defense for His Client Thus Denying Petitioner's Fifth and Sixth Amendment Constitutional Rights to a Fair Trial and Effective Assistance of Counsel.

Ground Seven: Petitioner Was Denied a Fair Trial Due to the Trial Judge's Bias and Partiality in Ruling on Procedures Which Resulted in a Denial of the Petitioner's Fifth Amendment Rights to a Fair Trial and the Courts Failure to Protect Petitioner's Constitutional Rights.

Ground Eight: the Cumulative Effect of the Aforementioned Errors Resulted in Prejudice to the Petitioner and Deprived Him of a Fair Trial and Due Process of Law as Guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of Ohio.

Ground Nine: Petitioner Was Prejudiced, When Appellate Counsel Failed, in Petitioner's Direct Appeal to Raise Numerous Errors Occurring in the Trial Proceeding, Thus Violating Petitioner's Right to Effective Assistance of Counsel as Guaranteed by the Sixth Amendment to the United States Constitution.

Petitioner then listed nine particular errors appellate counsel allegedly made. The magistrate judge filed a Report and Recommendation on January 3, 2001, recommending that the district court deny Petitioner's request. Petitioner filed objections. On April 4, 2001, the district court adopted the Report and Recommendation.

On April 19, 2001, Petitioner timely filed a notice of appeal, which this Court construed as an application for a certificate of appealability. *See* FED. R.APP. P. 22(b). This Court certified only four issues as appealable: (1) whether the Ohio Supreme Court unreasonably concluded that petitioner's fifth amendment right against self-incrimination was violated when the trial court admitted into evidence seven cartridges and one bullet from petitioner's residence that were located by police based on statements made by petitioner after he had requested an attorney; (2) whether the district court correctly held that petitioner procedurally defaulted on his claims that the state violated his right to due process and a fair trial by altering the alleged murder weapon before petitioner could have it independently tested; (3) whether Petitioner was denied effective assistance of trial counsel; and (4) whether Petitioner was denied effective assistance of appellate counsel.

## DISCUSSION

We review a district court decision to grant or deny a habeas writ *de novo,* but we scrutinize the district court's factual findings only for clear error. *Lucas v. O'Dea,* 179 F.3d 412, 416 (6th Cir.1999) (citing *Fair v. United States,* 157 F.3d 427, 430 (6th Cir.1998)).

Habeas petitions are governed by the Antiterrrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. § 2254 (Supp.2002) ("AEDPA")). AEDPA's objective is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1849, 152 L.Ed.2d 914 (2002). The statute provides:

    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect

to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

As the Supreme Court explained in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court's legal decision is "contrary to" clearly established federal law under §§ 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13, 120 S.Ct. 1495; *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir.2000). An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Under this standard, a state court decision is not unreasonable simply because the federal court concludes that the state court's decision is erroneous or incorrect. *Id.* at 411, 120 S.Ct. 1495. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12, 120 S.Ct. 1495; *see also McGhee,* 229 F.3d at 510. Finally, the *Williams* Court emphasized that "clearly established Federal law, as determined by the Supreme Court" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495.

## I.

Petitioner argues that police located the murder weapon based on statements he made in response to questioning after he requested an attorney. The Ohio Supreme Court ordered a new trial because the continued interrogation violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *See Knuckles I,* 65 Ohio St.3d 494, 605 N.E.2d 54. On retrial, the prosecution did not admit Petitioner's statements, but did introduce the weapon that police would not have found but for remarks extracted in violation of *Miranda.* Petitioner claims the court should have suppressed the gun as "fruit of the poisonous tree" under *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Supreme Court has used the "fruits of the poisonous tree" doctrine to remedy Fourth Amendment violations.[1] *See id.; see also Taylor v. Alabama,* 457 U.S. 687, 689–93, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 216–19, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Until very recently, the overwhelming majority of courts declined to

---

**1.** In a few cases, the Court has used the "fruits" doctrine to remedy violations of the Fifth and Sixth Amendments. *See United States v. Wade,* 388 U.S. 218, 239–42, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (applying the fruits doctrine to courtroom identifications resulting from pretrial identifications at which no defense counsel observed); *Nix v. Williams,* 467 U.S. 431, 442 & n. 3, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (applying doctrine to the fruits of compelled in-court testimony) (citing *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)).

extend the "fruit of the poisonous tree" doctrine to evidence seized after a *Miranda* infraction. *See, e.g., United States v. Elie*, 111 F.3d 1135, 1140 (4th Cir.1997); *United States v. McCurdy*, 40 F.3d 1111, 1117 (10th Cir.1994); *United States v. Mendez*, 27 F.3d 126, 130 (5th Cir.1994); *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1047–48 (9th Cir.1990); *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1517–18 (6th Cir.1988); *but see United States v. Byram*, 145 F.3d 405, 410 (1st Cir.1998) (refusing to "wholly bar the door to excluding evidence derived from a *Miranda* violation").

These courts relied on two cases, *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). Both *Tucker* and *Elstad* declined to suppress statements that were not pre-warning confessions (a post-warning confession in *Elstad* and a statement by another witness in *Tucker*) where those statements were the "fruit" of earlier *Miranda* violations. *See Elstad*, 470 U.S. at 306–08, 105 S.Ct. 1285; *Tucker*, 417 U.S. at 445–46, 94 S.Ct. 2357. Both cases based their conclusions at least in part on the assumption that *Miranda* was a prophylactic rule not constitutionally compelled. *See Tucker*, 417 U.S. at 445–46, 94 S.Ct. 2357 (distinguishing *Wong Sun* because "the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege"); *Elstad*, 470 U.S. at 308, 105 S.Ct. 1285 ("Since there was no actual infringement of the suspect's constitutional rights, [*Tucker*] was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed.").

Recently, however, in *United States v. Dickerson*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Court held that *Miranda* was a constitutional rule. *Id.* at 444, 86 S.Ct. 1602. Although the *Dickerson* Court expressly indicated that *Elstad* was consistent with its holding, *see* 530 U.S. at 441, 120 S.Ct. 2326, the *Dickerson* decision has raised some doubts about the continued viability of the *Elstad–Tucker* reasoning where the "fruit" of the *Miranda* violation is physical evidence. After the Court issued the *Dickerson* opinion, the federal courts of appeals have split over whether *Dickerson* made the fruits doctrine applicable to physical evidence. *See United States v. Patane*, 304 F.3d 1013, 1024 (10th Cir.2002) (holding that *Dickerson* made *Wong Sun* applicable to physical evidence), *petition for cert. granted*, no. 02–1183 (Apr. 21, 2003); *United States v. Faulkingham*, 295 F.3d 85, 90–94 (1st Cir.2002) (same), *petition for cert. filed*, no. 01–2276 (Oct. 7, 2002); *United States v. Sterling*, 283 F.3d 216, 218–19 (4th Cir.2002) (refusing to conclude that *Dickerson* made *Wong Sun* applicable to physical evidence), *cert. denied*, 536 U.S. 931, 122 S.Ct. 2606, 153 L.Ed.2d 792 (2002); *United States v. DeSumma*, 272 F.3d 176, 180–81 (3d Cir.2001) (same), *cert. denied* 535 U.S. 1028, 122 S.Ct. 1631, 152 L.Ed.2d 641 (2002).

■ We need not reach this interesting issue because, even assuming *Dickerson* prospectively requires the suppression of evidence seized in violation of *Miranda*, both *Teague* and AEDPA would prevent Petitioner from retroactively benefitting from a broader exclusionary rule.

In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held "that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retro-

actively to *all* defendants on collateral review." *Id.* at 316, 109 S.Ct. 1060 (emphasis added). The application of *Teague* is a threshold question in a federal habeas case. *Caspari v. Bohlen,* 510 U.S. 383, 388, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). The *Teague* inquiry involves three steps. *O'Dell v. Netherland,* 521 U.S. 151, 156–57, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

"First, the date on which the defendant's conviction became final is determined." *Id.* (citing *Lambrix v. Singletary,* 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997)). Petitioner's conviction became final on November 6, 1995, when the Supreme Court concluded Petitioner's direct appeal by denying *certiorari.*[2]

Second, this Court "considers whether 'a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Id.* (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)). If not compelled by existing precedent as of November 6, 1995, "then the rule is new." *Id.* As noted, in 1995, the overwhelming majority of courts refused to suppress physical evidence derived from information received in violation of *Miranda. See, e.g., Elie,* 111 F.3d at 1140; *McCurdy,* 40 F.3d at 1117; *Mendez,* 27 F.3d at 130; *Gonzalez–Sandoval,* 894 F.2d at 1047–48; *Sangineto–Miranda,* 859 F.2d at 1517–18. Thus, Petitioner requests the benefit of a "new rule" of constitutional law. *See Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) ("A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new

ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '*dictated* by precedent existing at the time the defendant's conviction became final.'") (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. 1060) (emphasis in original).

Third, this Court determines whether the new rule retroactively affects cases (like this one) on collateral review. *Teague*'s general non-retroactivity principle has only two narrow exceptions. The first exception permits retroactive application of new rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague,* 489 U.S. at 307, 109 S.Ct. 1060. This is obviously inapplicable here. The second exception allows retroactive application of new rules that involve procedures that are "implicit in the concept of ordered liberty." *Id.* Pursuant to this exception, federal courts may retroactively apply new rules of law on collateral review in cases involving "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Graham,* 506 U.S. at 461, 113 S.Ct. 892 (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. 1060). Referring to this exception as "circumscribed," the Court stressed that "[w]hatever the precise scope of this [second] exception, it is clearly meant to apply only to a small core of rules requiring observance of those procedures that … are implicit in the concept of ordered liberty." *Id.* (internal quotation marks omitted).

To qualify for the exception, a new rule must meet two conditions: (1) it must relate to the accuracy of the conviction; and

---

**2.** "Direct review" includes the 90–day period for seeking *certiorari. Penry v. Lynaugh,* 492 U.S. 302, 314, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Thus, direct review ceases when the Supreme Court denies *certiorari* or when

the time to file a *certiorari* petition expires. *Smith v. Bowersox,* 159 F.3d 345, 348 (8th Cir.1998); *Alexander v. Keane,* 991 F.Supp. 329, 334 n. 2 (S.D.N.Y.1998); *Hughes v. Irvin,* 967 F.Supp. 775, 778 (E.D.N.Y.1997).

(2) it must alter "our understanding of the 'bedrock procedural elements' essential to the [fundamental] fairness of a proceeding." *Sawyer v. Smith*, 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990)). Even assuming Petitioner's new rule alters our understanding of the basic process necessary for a fundamentally fair proceeding, the exclusion of reliable physical evidence derived from a *Miranda* violation does nothing to make verdicts more accurate. In fact, it would probably have the opposite effect. Thus, Petitioner may not benefit from the new rule he proposes.[3]

AEDPA also prevents Petitioner from invoking *Dickerson*. As the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), AEDPA's statutory language, "clearly established Federal law, as determined by the Supreme Court," refers to "the holdings, as opposed to the dicta, of this Court's decisions *as of the time of the relevant state-court decision.*" *Id.* at 412 (emphasis added). Therefore, AEDPA also makes *Dickerson* inapplicable to Petitioner's case. *Worden v. McLemore*, 200 F.Supp.2d 746, 752 (E.D.Mich.2002) (declining, based on AEDPA, to apply the *Wong Sun*/fruits doctrine to physical evidence based on *Dickerson* when habeas petitioner's conviction became final prior to the *Dickerson* decision); *Abraham v. Kansas*, 211 F.Supp.2d 1308, 1323 n. 10 (D.Kan.2002) (same).

## II.

■ Petitioner next argues that the prosecution altered the Raven handgun, and the trial court violated his due process rights by declining to make the weapon available to him for testing before the police modified it. The government argues that Petitioner procedurally defaulted on this claim, and we agree.

Before a state prisoner may seek a writ of habeas corpus, he must exhaust his state court remedies by fairly presenting all of his constitutional claims to all appropriate lower state courts and ultimately to the highest state court. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Habeas courts are generally barred from considering issues upon which a petitioner has "procedurally defaulted," or failed to properly raise in the state courts. *See Engle v. Isaac*, 456 U.S. 107, 110, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

This Court considers four factors to determine whether procedural default of a state rule will prevent a federal court's review on habeas. *Hutchison*, 303 F.3d at 736. First, the petitioner must have failed to comply with a state procedural rule applicable to his claim. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). Second, the state courts must have actually enforced the rule against the petitioner's claim. *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979); *Meeks v. Bergen*, 749 F.2d 322, 325 (6th Cir.1984). Third, the state procedural error must constitute an adequate and independent state law basis upon which the state can rely to foreclose federal review. *Harris v. Reed*, 489 U.S. 255, 160–62, 109 S.Ct. 1038,

---

**3.** The Supreme Court explained the rationale for this outcome: "The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered. This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

103 L.Ed.2d 308 (1989); *Allen,* 442 U.S. at 148, 99 S.Ct. 2213; *Wainwright v. Sykes,* 433 U.S. 72, 78, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Finally, if the above three factors apply, this Court may excuse the default if the petitioner can demonstrate "cause and prejudice," or that there was cause for his failure to follow the procedural rule and that he was actually prejudiced by the alleged constitutional mistake. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (citing *Sykes,* 433 U.S. at 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Even without finding cause and prejudice, this Court can still consider a petitioner's defaulted claim if failure to do so would result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris,* 489 U.S. at 262, 109 S.Ct. 1038. "The miscarriage of justice exception is concerned with actual as compared to legal innocence." *Calderon v. Thompson,* 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (quoting *Sawyer,* 505 U.S. at 339, 112 S.Ct. 2514)).

Normally, a federal habeas court will find that a petitioner defaulted if the last state court rendering a decision makes a plain statement to that effect. *Harris,* 489 U.S. at 261, 109 S.Ct. 1038. No such statement is necessary, however, if the petitioner failed to present the relevant issues to the state court. *Id.* at 263 n. 9, 109 S.Ct. 1038.

Petitioner raised the altered evidence issue again in his second post-conviction petition. (J.A. at 70.) The trial court found the claim barred by *res judicata,* as did the Ohio Court of Appeals. (*Id.*) On June 14, 1995, the Ohio Supreme Court then denied leave for further appeal without comment. (J.A. at 88.). In situations like this one, when "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). The Ohio Court of Appeals, in turn, had an adequate state law basis, i.e., *res judicata,* for considering Petitioner's claims defaulted. Ohio courts customarily rely on *res judicata* when declining to consider issues in state post-conviction proceedings that petitioners could have raised on direct appeal. *Byrd v. Collins,* 209 F.3d 486, 520–22 (6th Cir.2000) (discussing the use of *res judicata* by Ohio courts in post-conviction proceedings). Thus, Petitioner's due process and ineffective assistance claims are procedurally defaulted.

Petitioner has failed to demonstrate either cause and prejudice or that failure to consider either claim will produce a "fundamental miscarriage of justice," *see Harris,* 489 U.S. at 262, 109 S.Ct. 1038. Since there is no evidence that prosecutors tampered with the Raven, Petitioner has no evidence of prejudice with respect to his due process claim.

### III.

■ Petitioner argues that he received ineffective assistance of trial counsel because counsel failed to object to the testimony of the victim's daughter, Bobby Blackwell. Blackwell testified that her father told her the day before the murder that he would not loan Petitioner any more money because Petitioner would only use the money for drugs. Petitioner claims counsel was ineffective for failing to object to this testimony, which Petitioner characterizes as hearsay.

Petitioner did not raise either the due process claim or the ineffective assistance of trial counsel claim on direct appeal. *See State v. Knuckles (Knuckles II),* 1995 WL 22713 (Ohio Ct.App. Jan. 23, 1995). Con-

sequently, when Petitioner made the argument for the first time in his initial post-conviction petition, the court found the claim barred by *res judicata.* Petitioner did not appeal. Thus, the claim is defaulted. *See Byrd,* 209 F.3d at 520–22.

We cannot excuse the default. The declarant's statement to Bobby Blackwell falls within a hearsay exception since the declarant was "unavailable," probably because Petitioner killed him. *See* MICH. R. EVID. 804(b)(6) (codifying hearsay exception for "a statement offered against a party that has engaged in or encouraged wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness"). Thus, Petitioner has failed the prejudice prong of the "cause and prejudice" test for excusing procedural default.[4]

■ Even if he could show prejudice, Petitioner cannot show cause. Petitioner argues that the ineffective assistance of his appellate counsel caused his procedural defaults. The Supreme Court has held, however, that an ineffective assistance of appellate counsel claim can itself be procedurally defaulted. *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). In this case, the Ohio Court of Appeals denied Petitioner's application for delayed reopening of his appeal on the basis of ineffective appellate counsel because Petitioner had failed to show good cause to justify his untimely filing as required by Ohio R.App. P. 26(B). The Ohio Supreme Court subsequently refused to hear Petitioner's appeal, making the Ohio Court of Appeals' decision the last explained decision with respect to the ineffective assistance of appellate counsel issue. The timeliness requirement of Ohio R.App. P. 26(B) provides an adequate state law basis for the Court of Appeals' adjudication and, following *Ylst,* this Court presumes that the subsequent unexplained order by the Ohio Supreme Court incorporated the procedural default. 501 U.S. at 803, 111 S.Ct. 2590. Thus, Petitioner procedurally defaulted on his ineffective assistance of appellate counsel claim, which means that alleged ineffective assistance cannot serve as cause to justify Petitioner's other procedural defaults.[5] *Edwards,* 529 U.S. at 451, 120 S.Ct. 1587.

The fundamental miscarriage of justice exception also does not apply, because Petitioner has not shown actual innocence. *See Calderon v. Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

## IV.

Last, Petitioner argues that ineffective assistance of appellate counsel provides an independent basis for habeas relief because appellate counsel failed to present nine errors on direct appeal. Specifically,

---

4. If this Court considered the merits of his ineffective assistance claim, Petitioner's case is nowhere near meeting the rigors of the test for ineffective assistance articulated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." Again, Petitioner has shown neither deficient performance nor prejudice.

5. In theory, Petitioner could default on his ineffective assistance of appellate counsel claim and still use ineffective assistance of appellate counsel as cause to justify his other procedural defaults if he could meet the cause and prejudice requirements (or the fundamental injustice requirement) with respect to the ineffective assistance of appellate counsel procedural default. Petitioner offers no arguments to support this rather circuitous route to relief, and none are apparent from the record.

Petitioner claims his appellate counsel was ineffective for neglecting these issues:

(a.) appellate counsel failed to present, the trial court's error in refusing to suppress evidence that had been destroyed/altered during testing of the [Raven MP25] evidence, without proper notification made to the defense counsel, thus, precluding Appellant from performing his own independent test on this evidence before the alteration. And,

(b.) appellate counsel failed to present, trial counsel's failure to call witnesses, file essential pretrial motions and/or conduct an adequate defense, due to trial counsel's mistaken belief that Appellant's conviction would be overturned by the court of appeals. And,

(c.) appellate counsel failed to present, the trial court's error in admitting Physical evidence obtained as a result of statements made pursuant to an illegal interrogation in violation of *Edwards v. Arizona*. This evidence constituted "fruit" of the poisonous tree, and therefore, the trial court was required to suppress the evidence. And,

(d.) appellate counsel failed to present, trial counsel's failure to object to hearsay testimony presented by the victim's daughter, who allegedly had a telephone conversation with her father (while she was in Germany), the day before his death. When the State was using this witness to prove motivation and causation for the alleged offense. And,

(e.) appellate counsel failed to present, trial counsel's failure to address the issue of a Pro Se motion, filed by their client while awaiting trial, which motion was identically filed at his first trial. But, due to the inad-

equacy of counsel at the second trial, counsel failed to present this issue, where evidence was seized without a search warrant, which evidence was also the "fruit" of the poisonous tree argument. And,

(f.) appellate counsel failed to present, trial counsel's failure to object to impeachable testimony of a police officer, whose testimony was not consistent with his testimony at the first trial. Also, trial counsel's refusal to call patrolman Martin to testify, when requested by their client to have this officer's testimony impeach the testimony of the State's witness Detective Storey, and testimony would exonerate the accused. And,

(g.) appellate counsel failed to present, trial counsel's failure to object to the trial judge's use of prior rulings from Appellant's first (1989) trial motions, which trial had been reversed by the Ohio Supreme Court. Defense counsel filed identical motions at the [de novo] new trial, as they had filed before. A different trial judge crafted those rulings, however, counsel failed to object to the [new trial] judge using those rulings to answer and/or avoid answering the motions being presented, which use prejudiced the outcome of the Appellant's new trial. And,

(h.) appellate counsel failed to present, trial counsel's failure to object to the trial court's admission of evidence obtained through a warrantless search of the Appellant's residence. Where evidence was seized before the search was executed, which admission of evidence preju-

diced Appellant, and tainted the outcome of the trial proceedings. Whereas, now placing a burden on the accused to seek a resolve to a "landmark" question on "fruits" collected in violation of *Miranda v. Arizona.* And,

(i.) appellate counsel failed to present, the Cumulative Effect Issue, of the numerous procedural errors, prejudicial rulings and errors of Due Process, that was presented in this [de novo] trial court proceedings, which prejudiced the Appellant and tainted the outcome.

(errors and alterations in original). Most of these alleged mistakes are jumbled, incoherent, or repetitive. Some of the claims are vague, but Petitioner provides no further detail.

As already explained, Petitioner defaulted on his ineffective assistance of appellate counsel claim. To show prejudice, Petitioner must demonstrate that if this Court considered the merits of the ineffective assistance of appellate counsel claim, he would prevail. The standard explained in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to a defendant's claim that his appellate counsel was ineffective. *Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Smith v. Murray,* 477 U.S. 527, 535–36, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). The defendant must first "show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Second, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" is

"a probability sufficient to undermine confidence in the outcome." *Id.*

Since Petitioner offers no factual basis or legal analysis in support of any of the nine errors he now suggests appellate counsel should have raised, this Court cannot conclude that appellate counsel's conduct fell below an "objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. If appellate counsel's representation did fall below an objective standard of reasonableness, none of the Petitioner's litany of alleged errors is serious enough "to undermine confidence in the outcome." *Id.* at 694–95, 104 S.Ct. 2052.

Of course, this *Strickland* analysis only addresses the prejudice half of the ultimate "cause and prejudice" question. Even if Petitioner could meet the prejudice component of the "cause and prejudice" procedural default exception, he has not established cause. Petitioner offers no reason why he did not complain about the ineffective assistance of his appellate counsel earlier.

Finally, as with the other claims, the fundamental miscarriage of justice exception is inapplicable here. *See Calderon v. Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief.