UNITED STATES of America,
Plaintiff,

v.

Robert Terrill WILLIAMS, Defendant.

No. CR. 02–50060.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 11, 2003.

Federal Defender, Federal Defender Office, Flint, for dft represented by Federal Defender.

Robert W. Haviland, Eastern District of Michigan, U.S. Attorney's Office, Flint, for pla represented by Haviland.

Kenneth R. Sasse, Federal Defender Office, Flint, for dft represented by Sasse.

## MEMORANDUM OPINION AND OR-DER DENYING DEFENDANT'S MOTION TO SUPPRESS EVI-DENCE

GADOLA, District Judge.

Before the Court is Defendant's motion to suppress evidence. For the reasons set forth below, the Court shall deny Defendant's motion.

## I. BACKGROUND

On October 16, 2002, a grand jury charged Defendant, a convicted felon, with two counts of possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On December 19, 2002, Defendant filed a motion to suppress evidence. Defendant moves to suppress the evidence supporting Count II of the indictment only.

In Count II of the indictment, the grand jury has alleged

[t]hat on or about August 7, 2002, at or near the intersection of Mason and Dewey Streets, Flint, in the Eastern District of Michigan, ROBERT TERRILL WILLIAMS, having been convicted and sentenced on or about July 27, 1994 in the Genesee County Circuit Court, State of Michigan, of delivery of a controlled substance, a crime punishable by imprisonment for more than one year, knowingly did possess a firearm in and affecting commerce, that is, a Hi–Point, .45 caliber semi-automatic pistol bearing serial number 304158; all in violation of

section 922(g)(1) of Title 18, United States Code.

The Court conducted an evidentiary hearing in this matter on February 26, 2003. Following the evidentiary hearing, the Court permitted the parties to obtain a transcript and file supplemental briefs. Defendant filed a post-hearing memorandum on April 7, 2003. The Government filed its supplemental response brief on April 18, 2003, and Defendant filed his reply brief on April 23, 2003. The Court heard oral argument on June 4, 2003. At oral argument, the Court granted Defendant leave to submit additional evidence, which Defendant submitted on June 16, 2003.

At the evidentiary hearing, Officers Rodney Hall and Troy Simpson, and Sergeant Jimmie Edwards, all of the Flint Police Department, testified on behalf of the Government. Defendant did not produce any witnesses. Defendant offered into evidence the transcript of the preliminary examination conducted in the State of Michigan 68th District Court on August 20, 2002 concerning the events at issue in this case. Officers Hall and Simpson testified at the state court preliminary examination, and the Court received the transcript of that hearing insofar as it concerned the testimony of these two officers. Prior to the evidentiary hearing, Defendant introduced two police reports prepared regarding the events at issue in this case as exhibits to his motion to suppress evidence.

Officer Hall testified in this Court that, on August 7, 2002, he and his partner, Officer Simpson, were in uniform and assigned to third shift patrol in a fully marked patrol car. (E.H.5–6.)[1] Officer Hall testified that at approximately 1:07 a.m. on August 7, 2002, he was driving the patrol car westbound on Pasadena in Flint, approaching M.L. King, and Officer Simpson was the passenger. (E.H.6.) The traffic light at M.L. King was red. (E.H.6.) As the patrol car approached the intersection, Officer Hall observed a vehicle traveling southbound on M.L. King. (E.H.6.) The vehicle turned westbound onto Pasadena, and Officer Hall testified that he heard the vehicle's tires squeal as it made the turn. (E.H.6.) The vehicle had a loud exhaust and accelerated suddenly after making the turn onto Pasadena. (E.H.6–7.) Officer Hall identified the vehicle as an Oldsmobile. (E.H.9, 15.) Officer Hall made sure that the intersection of M.L. King and Pasadena was clear and then drove the patrol car through the intersection and the red light. (E.H.8.)

After passing through the intersection, Officer Hall accelerated the patrol car up to the speed limit, which he believed to be thirty-five miles per hour. (E.H.8.) Although Officer Hall "had already attained the speed limit or just above, the [Oldsmobile] was still gaining speed and pulling at a greater distance." (E.H.8.) Officer Hall testified that he was "absolutely" confident that the Oldsmobile was speeding. (E.H.9.)

At the intersection of Pasadena and Mason, the Oldsmobile turned southbound onto Mason. (EH 8.) The officers followed the Oldsmobile onto Mason, and at that point, Officer Hall activated the patrol car's emergency lights and siren. (EH 8.) The Oldsmobile then turned westbound onto Dewey Street, which was the first cross-street, and came to a stop. (EH 8–10.)

Officers Hall and Officer Simpson noted two individuals in the vehicle, a male driver and a female passenger. (EH 10.) Of-

---

**1.** Citations designated "E.H." refer to the transcript of the February 26, 2003 evidentia-ry hearing conducted in this Court.

ficer Simpson approached the driver's side of the vehicle, asked the driver for his license, and, when the driver responded that he did not have a license, Officer Simpson removed him from the vehicle. (EH 10.) Officer Simpson then placed the driver under arrest for driving without an operator's license and handcuffed him. (EH 10.) While Officer Simpson was arresting the driver, Officer Hall remained near the front passenger side of the vehicle but did not question the passenger at that time. (EH 10–11.)

Officer Hall testified that, after Officer Simpson had secured the driver, "he hollered out to me that there was a gun under the passenger's front seat." (EH 11.) Officer Hall drew his weapon, ordered the passenger from the front seat, and handcuffed her. (EH 11.) After securing the passenger, Officer Hall located a .45 caliber handgun underneath the front passenger seat. (EH 11–12.) The handgun was loaded, with one round in the chamber and six or seven live rounds in the magazine. (EH 12.) At that point, the passenger was placed under arrest for carrying a concealed weapon. (EH 12.)

Officer Troy Simpson's testimony corroborated Officer Hall's version of the events leading up to the stop of the Oldsmobile on Dewey Street. (EH 23–25.) After the officers had stopped the Oldsmobile on Dewey Street, Officer Simpson approached the driver's side of the vehicle and asked the driver for his driver's license, registration, and proof of insurance. (EH 25.) When the driver indicated that he had neither a license nor identification, Officer Simpson escorted the driver out of the vehicle and placed him under arrest for driving without an operator's license. (EH 25.)[2] Officer Simpson testified that the driver exited the vehicle voluntarily and that he handcuffed the driver after placing him under arrest. (EH 25.) The driver of the Oldsmobile was later identified as Defendant. (EH 30.)

After placing Defendant in handcuffs, Officer Simpson described the following events:

A. He was searched; and immediately thereafter, I was walking back to place him in the back seat of our cruiser. And I asked the driver, I said, 'Is there anything inside the vehicle that's going to poke or hurt me or my partner?'

Q. And what did he say?

A. He replied, "Well, how much trouble am I going to get into?"

Q. Those were his exact words?

A. His exact words were—let me get this right—I believe those were his exact words. Yes.

Q. All right. What did you—did you say anything in response to that comment?

A. With a question like that, I'd ask him—I said, "Well, it depends on what's in the car. You know, if it's gonna hurt us, it all depends on what's in the car. I can't answer the question. What's in the car?"

Q. What did he say then?

A. He said, "I have a four five underneath the passenger seat."

Q. Again, those are his exact words?

2. Officer Simpson testified on direct examination at the evidentiary hearing that "I escorted the driver out of the vehicle." (E.H.25.) On cross-examination, however, Officer Simpson testified that he approached the driver's side of Defendant's vehicle because Defendant had "already stepped out of the car." (E.H. 34.) Thus, it is unclear at exactly what point Defendant stepped out of his vehicle. However, it appears undisputed that Defendant voluntarily stepped out of his vehicle. It is also undisputed that Defendant was arrested for driving without an operator's license and handcuffed.

A. Those were his exact words. (EH 26.)

Officer Simpson testified that he understood Defendant's reference to a "four five" to mean a .45 caliber pistol. (EH 27.) Officer Simpson immediately advised Officer Hall of the presence of a gun under the front passenger seat. (EH 27.) Officer Simpson noted that, because the passenger was still in the vehicle, "it was important for my partner to get this person out [of] the car to make ... [it] safe." (EH 27.) Officer Simpson then placed Defendant in the patrol car and called for backup. (EH 27.) Officer Simpson confirmed that Officer Hall removed the passenger from the vehicle and handcuffed her. (EH 28.) Simpson also confirmed that Officer Hall then searched the vehicle, locating a .45 caliber handgun under the front passenger seat. (EH 28.) Thereafter, one of the officers called a tow truck and the Oldsmobile was towed from the scene. (EH 29.)

Officer Simpson testified that it was typical of him and his partner to ask whether there was anything inside of a vehicle "because we don't want to get hurt." (EH 31.) He explained, "I don't know if there's a knife underneath the seat or anything of that nature that's gonna hurt us. It's routine." (EH 31.)

Flint Police Sergeant Jimmie Edwards testified at the evidentiary hearing that Officers Hall and Simpson brought Defendant to the criminal investigation room at the Flint Police Department in the early morning of August 7, 2002. (EH 39–40.) Sergeant Edwards testified that he advised Defendant of his *Miranda* rights by reading the rights to Defendant from a card. (EH 40–41.) Defendant waived his rights and agreed to speak with Sergeant Edwards. (EH 41.) Defendant acknowledged that he had been arrested because he had a gun in his car. (EH 41.) However, when Edwards asked Defendant where, when, and from whom he had obtained the gun, Defendant allegedly replied, " 'I can't say.' " (EH 41–42.)

## II. ANALYSIS

Defendant raises two primary issues in his motion to suppress evidence: (1) whether the initial stop of his vehicle was supported by probable cause; and (2) whether his post-arrest statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant moves to suppress from evidence any incriminating statements that he made following his arrest, the .45 caliber pistol seized from the vehicle, and any derivative evidence.

### A. THE INITIAL STOP OF DEFENDANT'S VEHICLE

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[3] The stop of a vehicle by the police, regardless of the duration and purpose of the stop, is a seizure of persons under the Fourth Amendment and must therefore be reasonable. *United States v. Williams*, 114 F.Supp.2d 629, 630–31 (E.D.Mich.2000)

---

**3.** A defendant seeking to challenge a search or seizure pursuant to the Fourth Amendment must first establish that he has standing to challenge the search or seizure. *See United States v. Hartwell*, 67 F.Supp.2d 784, 793 (E.D.Mich.1999) (Gadola, J.). The Government has not raised the issue of standing in opposition to Defendant's motion. In any event, it appears that Defendant has standing to challenge the police actions in this case because Defendant was driving his own car when he was stopped by the police.

(Gadola, J.). "In general ... an automobile stop is considered reasonable 'where the police have probable cause to believe that a traffic violation has occurred.'" *United States v. Copeland,* 321 F.3d 582, 592 (6th Cir.2003) (quoting *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).[4] "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993) (en banc) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990)). "The probable cause doctrine is a flexible, commonsense standard [that] requires that the facts available to the officer would warrant a man of reasonable caution to believe that a crime is afoot." *Copeland,* 321 F.3d at 592 (internal quotations and citations omitted) (alteration in original). "[I]t is the responsibility of the courts to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop." *United States v. Hill,* 195 F.3d 258, 267 (6th Cir.1999).

Here, Officer Hall testified that he heard the tires squeal on Defendant's vehicle as it turned onto Pasadena Street, that the vehicle had a loud exhaust, and that the vehicle accelerated suddenly after turning westbound onto Pasadena. (E.H.6–7.) Officer Hall further testified that in his pursuit of Defendant's vehicle, he accelerated his police cruiser up to the thirty-five miles per hour speed limit but that Defendant's vehicle continued to pull away. (E.H.8.) Officer Simpson confirmed

Officer Hall's version of these events. (E.H.23–25.) Defendant concedes that the testimony of the officers, on the surface, is sufficient to establish that the officers had probable cause to believe that Defendant was speeding. Def. Post–Hrg. Mem. at 3. However, Defendant argues that the officers' testimony lacks credibility.

First, Defendant questions the officers' claim that, while pursuing Defendant, the police cruiser accelerated to thirty-five miles per hour while Defendant's vehicle continued to pull away. On cross-examination at the evidentiary hearing, Defendant's counsel asked Officer Simpson to compare the distance on Pasadena between M.L. King and Mason to the distance in front of the Flint Federal Courthouse on Church Street between Second and Third Streets. Although Officer Simpson's testimony was somewhat ambiguous, Simpson appeared to indicate that the distance on Pasadena between M.L. King and Mason, a distance of three city blocks, was "a little bit farther" than the distance on Church Street between Second and Third Streets in front of the Courthouse. (E.H.33.) Prior to this statement, however, Officer Simpson had also estimated that the relevant distance on Pasadena was two to three hundred yards. (E.H.32.)

Suggesting that the distance traveled on Pasadena was "relatively short," Defendant argues that the officers' testimony regarding the acceleration of Defendant's vehicle and their own police cruiser was "inherently incredible." Def. Post–Hrg. Mem. at 4. Noting the ambiguity in Simpson's testimony, the Court granted Defendant's request for additional time to

---

4. Defendant argues that a stop is reasonable only when it is supported by probable cause. This Court has held, however, that the stop of a vehicle is reasonable under the Fourth Amendment when it is supported merely by reasonable suspicion. *Gaddis v. Redford Twp.,* 188 F.Supp.2d 762, 768 (E.D.Mich. 2002) (Gadola, J.). This Court need not revisit this issue in the present case, however, because the Court finds that the officers had probable cause to stop Defendant's vehicle.

obtain from the City of Flint a precise measurement of the distance on Pasadena between M.L. King and Mason.

On June 16, 2003, Defendant's counsel, Mr. Kenneth Sasse, submitted to the Court an affidavit which recounted Mr. Sasse's June 7, 2003 conversation with a representative of the City of Flint Traffic and Engineering Division. (*See* Sasse Aff. at ¶ 2.) Upon inspection of aerial photographs of the City of Flint, a representative of the Traffic and Engineering Division determined that the distance on Pasadena between M.L. King and Mason, a total of three city blocks, was 888 feet. (*See id.* at ¶ 3.) This distance was measured from the center of the intersection at Pasadena and M.L. King to the center of the intersection at Pasadena and Mason. (*See id.*) Further, the representative of the Traffic and Engineering Division determined that the distance on Church Street between Third Street and Second Street, measured in the same manner, was 397 feet. (*See id.* at ¶ 4.)

Based upon these measurements, it appears that Officer Simpson was not entirely correct when he estimated that the distance on Pasadena between M.L. King and Mason was "a little bit farther" than the distance on Church Street between Third Street and Second Street. The relevant distance on Pasadena is over two times the relevant distance on Church Street. Officer Simpson was fairly accurate, however, when he estimated that the actual distance traveled on Pasadena was two to three hundred yards. In any event, the fact that the relevant distance on Pasadena is 888 feet weakens Defendant's argument considerably. As noted above, Defendant suggested that the police cruiser could not have accelerated as the officers claimed in the "relatively short" distance on Pasadena. Of course, this argument was premised upon Defendant's assumption that the distance was just a bit farther than the distance on Church Street in front of the Flint Federal Courthouse, a distance that proved to be 397 feet. Without attempting detailed mathematical computations, the Court concludes that the officers' testimony regarding the acceleration of Defendant's vehicle and their own police cruiser was not "inherently incredible" in light of the fact that the distance traveled on Pasadena was some 888 feet, a distance roughly equal to three football fields.

The officers' testimony is supported further by the fact that neither vehicle began its acceleration on Pasadena from a complete stop. Officer Hall testified that, as he approached the intersection of Pasadena and M.L. King, he "cleared" the intersection and went through the red light after observing Defendant's vehicle squeal its tires around the corner. (E.H.8.) Thus, the police cruiser was already moving when it crossed the intersection at Pasadena and M.L. King and thus had even more than 888 feet in which to accelerate to thirty-five miles per hour. Defendant's car also did not begin its acceleration on Pasadena from a complete stop, but rounded the corner fast enough to squeal its tires. (E.H.6–7.) Finally, the fact that the distance traveled was relatively longer than initially suggested supports Officer Hall's testimony that he was at the speed limit and still observing Defendant's vehicle pulling away for roughly half the distance between M.L. King and Mason. (E.H.19.) Based upon these additional facts, the Court finds the officers' testimony as to the acceleration of Defendant's vehicle and their police cruiser to be credible.

Next, Defendant argues that the testimony of both officers at the evidentiary hearing was to some extent inconsistent with their testimony at the preliminary examination in state court. For example, Defendant suggests that Officer Hall testi-

fied inconsistently with respect to whether he was certain that Defendant was speeding. At the February 26, 2003 evidentiary hearing in this Court, Officer Hall was "absolutely" confident that Defendant's vehicle was speeding, (E.H.9), and that "[t]here was no speculation on [his] part" as to whether Defendant was speeding. (E.H. 16.) However, at the August 20, 2002 state court preliminary examination, Officer Hall provided a slightly different assessment. When asked the basis of the traffic stop, Officer Hall testified:

A. It was like—more or less erratic driving.

Q. Erratic driving? Can you be a little more descriptive for us? . . . .

\* \* \* \* \* \*

A. The time period it took him to get from M.L. King to Mason Street was just a matter of seconds.

Q. Okay.

A. My partner said to me, "Man, he['s] driving awful fast." And I said, "Yeah," I could hear the acceleration when it took off onto Dupont Street from M.L. King. I'm sorry, Pasadena.

Q. You can't say with any certainty that my client was speeding though, can you?

A. I cannot, only from what we observed. No.

Q. Just speculation?

A. Yes.

(P.E. 32–33.) [5]

At the February 26, 2003 evidentiary hearing, Officer Hall explained the inconsistency in his testimony, stating that his "speculation" at the preliminary examination was due to the fact that he "had no radar set up, and . . . had no way to gauge the speed on any amount of pacing to give an exact charge of speeding." (E.H.17.) Officer Hall's explanation of his state court

testimony is plausible. Without radar set up, he was unable to determine the exact speed of Defendant's vehicle. Yet, based upon his observations, Officer Hall could have determined that Defendant was speeding.

Defendant also argues that Officer Simpson testified inconsistently at the state court preliminary examination with respect to whether Defendant's vehicle was "pulling away" from the police vehicle as Defendant accelerated on Pasadena. At the evidentiary hearing, Officer Simpson testified that "Officer Hall increased his rate of speed up to the speed limit, and the vehicle still was pulling away from our cruiser." (E.H.24.) However, on direct examination at the state court preliminary examination, Officer Simpson testified:

We observed a gray Oldsmobile traveling southbound on M.L. King approaching Pasadena. He made a right hand turn, which would be going westbound, broke a little traction when he turned the corner, he squealed his tires a little bit and accelerated at a high rate of speed. *At that pont, we closed the distance between our cruiser and the vehicle.*

(P.E. 5–6 (emphasis added).)

This testimony would appear to be inconsistent with Officer Simpson's testimony at the evidentiary hearing. However, on cross-examination in state court, Officer Simpson also testified:

Q. You indicated that [Defendant's] car was traveling at a high rate of speed, is that correct?

A. That's correct.

Q. Okay, do you know how fast he was going?

---

5. Citations designated "P.E." refer to the transcript of the August 20, 2002 preliminary examination hearing conducted in the State of Michigan 68th District Court.

A. No, I mean ... we didn't have radar, even if we did, there is no way we could track, *because the vehicle is actually pulling away.*

Q. And so based on the fact that you heard the tires chirp, and you believed he was traveling at a high rate of speed, you pulled him over, is that correct?

A. That's correct.

(P.E. 17 (emphasis added).)

Officer Simpson further testified on cross-examination at the preliminary examination:

A. "[T]urning the corner, he was probably going twenty miles an hour, after that, like I said, you could hear the acceleration of the engine, and it was pulling away at a high rate of speed. And the speed limit in there, I believe, on Pasadena, right there, might be thirty or thirty-five.

Q. And you don't know that my client was traveling over thirty-five, do you?

A. *Based on my usual experience, I could tell you it was above-thirty-five miles [per] hour.*

(P.E. 19 (emphasis added).)

Based upon these additional excerpts from the preliminary examination in state court, the Court concludes that Officer Simpson's testimony in this Court was not inconsistent with his testimony in state court on the issue of whether Defendant was speeding at the time that the officers pursued him on Pasadena. Officer Simpson testified in the state court that he believed that Defendant was speeding. Further, Officer Simpson's state court testimony confirms Officer Hall's explanation of why the officers could not determine the precise speed of Defendant's vehicle—"we didn't have radar, even if we did, there is no way we could track, because the vehicle is actually pulling away." (P.E. 17.)

Finally, Defendant notes that both officers testified inconsistently as to who was driving the patrol car at the time of the incident in question. Officer Hall testified at the February 26, 2003 evidentiary hearing that "I was the driver at that particular point and Officer Simpson was a passenger." (E.H.6.) In contrast, Officer Hall testified at the preliminary examination in state court that "I was a passenger in the vehicle Officer Simpson was driving." (P.E. 29.) Officer Simpson testified at the February 26, 2003 evidentiary hearing that he was not the driver of the patrol car at the time of the incident in question. (E.H.34.) However, at the preliminary examination in the state court, Officer Simpson testified that "I was the driver. Officer Hall would have been the passenger." (P.E. 6.) Officer Simpson explained his inconsistent testimony at the February 26, 2003 evidentiary hearing by stating that he "misspoke" at the preliminary examination. (E.H.35.) While this inconsistency is worth noting, the Court finds, on balance, that the matter of which officer was driving the car is relatively insignificant. Thus, although the inconsistency in the officers' testimony on this matter may cause one to question the accuracy of their testimony, there appears to be no reason that they would testify untruthfully about such an insignificant detail. Moreover, as the Government suggests, it is likely that these officers, who have been partners for some time, (*see* E.H. 6), were simply mistaken as to which one was driving the police cruiser on the night in question.

Based upon the officers' testimony, the Court concludes that the officers had probable cause to believe that Defendant was speeding. Accordingly, the stop of Defendant's vehicle was not in violation of the Fourth Amendment.

## B. DEFENDANT'S STATEMENTS AT THE TIME OF HIS ARREST

At the February 26, 2003 evidentiary hearing in this Court, Officer Simpson tes-

tified that, after placing Defendant under arrest, he asked Defendant whether there was "'anything inside the vehicle that's going to poke or hurt me or my partner.'" (E.H.26.)[6] Defendant allegedly responded by asking, "'Well, how much trouble am I going to get into?'" (E.H.26.) Officer Simpson then stated, "'Well, it depends on what's in the car. You know, if it's gonna hurt us, it all depends on what's in the car. I can't answer the question. What's in the car?'" (E.H.26.) In response to that question, Defendant allegedly stated, "'I have a four five underneath the passenger seat.'" (E.H.26). Officer Hall eventually recovered a forty-five caliber handgun under the front passenger seat of Defendant's vehicle. It is undisputed that Officer Simpson did not advise Defendant of his rights under the *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to questioning Defendant. Alleging that this questioning was in violation of *Miranda*, Defendant seeks the suppression of his statement.

## 1. WHETHER DEFENDANT'S STATEMENTS WERE OBTAINED IN VIOLATION OF *MIRANDA*

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda* the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S at 444, 86 S.Ct. 1602. If police interrogate a suspect in custody without informing the suspect of the *Miranda* warnings, "*Miranda* dictates that the answers

received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In *Miranda* the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. "A suspect is 'in custody' for purposes of receiving *Miranda* protection if there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir.2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). "Interrogation" includes "express questioning and its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Therefore, "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682; *see United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993).

■ Turning to the present case, it is clear that Defendant was "in custody" at the time he was questioned because Officer Simpson had placed Defendant under formal arrest and handcuffed him *prior* to asking the question about the contents of Defendant's vehicle. *See Mason*, 320 F.3d at 631. Whether Officer Simpson's post-arrest questioning constituted "interrogation," however, is dependent upon what Officer Simpson actually asked Defendant

---

**6.** Officer Simpson testified that he placed Defendant under arrest for driving without a license. Defendant does not contest the legality of his arrest.

after placing him under arrest. Since the incident, Officer Simpson has provided *three* different versions of his statement to Defendant. At the August 20, 2002 preliminary examination in state court, Officer Simpson testified that, after placing Defendant under arrest, "I asked him if there was anything in the car we needed to know about." (P.E. 22.) In Officer Simpson's report of the incident, which he drafted on August 23, 2002, Officer Simpson wrote, "I asked Williams if there was any contraband inside of his vehicle." (Def.Attach.1B.) And finally, at the February 26, 2003 evidentiary hearing in this Court, Officer Simpson testified that he asked Defendant whether there was " 'anything inside the vehicle that's going to poke or hurt me or my partner.' " (E.H.26.)

When determining whether a police officer's questioning of a suspect in custody constitutes "interrogation" within the meaning of *Miranda,* "courts should carefully scrutinize the factual setting of each encounter of this type." *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir.1983). "Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.*

■ Because of the inconsistencies in Officer Simpson's recollection of the incident, the Court views Officer Simpson's testimony at the February 26, 2003 evidentiary hearing with some skepticism. Although it is of course possible that Officer Simpson asked Defendant the seemingly innocuous question about whether there was anything in the vehicle that might "poke or hurt" the officers, the Court finds it equally probable that Officer Simpson asked Defendant a more ambiguous question, such as whether there was anything in the car that the officers needed to know about, (*see* P.E. 22), or a more direct ques-

tion, such as whether there was any contraband in the car, (*see* Def. Attach. 1B).

■ Therefore, construing Officer Simpson's conflicting testimony in Defendant's favor, the Court finds that Defendant was subject to "interrogation," that is, Officer Simpson should have know that his question was reasonably likely to elicit an incriminating response from Defendant. Asking Defendant whether there was anything that the officers needed to know about or whether there was any contraband in the car are questions that, under the circumstances, were reasonably likely to elicit an incriminating response. Such questions differ from routine booking questions regarding, for example, biographical information, which the Sixth Circuit has held does not constitute "interrogation" for purposes of *Miranda. See Avery,* 717 F.2d at 1025. Therefore, Officer Simpson's questioning of Defendant constituted "interrogation" under *Miranda.*

Because Officer Simpson subjected Defendant to custodial interrogation without administering the *Miranda* warnings, Defendant's statement regarding the gun must be excluded from evidence, *see Elstad,* 470 U.S. at 307, 105 S.Ct. 1285, unless an exception to *Miranda* applies. For the reasons set forth below, the Court concludes that, even if a *Miranda* violation occurred, Defendant's statement may be admitted under the "public safety exception" to *Miranda.*

## 2. THE "PUBLIC SAFETY" EXCEPTION

■ In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court held that when police officers ask a suspect "questions reasonably prompted by a concern for the public safety," the officers need not administer the *Miranda* warnings prior to engaging

in such questioning. *Id.* at 656, 104 S.Ct. 2626. This Court has previously applied the public safety, explaining:

> [O]nce Trooper Weber felt a gun on the person of defendant Hartwell during the pat-down search, Weber informed his partner, Trooper Gillette, that he had found the gun. Trooper Gillette then asked defendant Copeland whether he too had a gun. Copeland informed the officer that there was another gun in the car. A search of the vehicle revealed the .25 caliber handgun laying on the backseat floorboard.
>
> \*  \*  \*  \*  \*  \*
>
> In [*Quarles* ], the Supreme Court recognized the so-called "public safety" exception to the *Miranda* rule. In that case, the defendant was stopped in a supermarket by police on suspicion of rape. *See Quarles,* 467 U.S. at 652, 104 S.Ct. 2626, 81 L.Ed.2d 550. The police officer ordered the suspect to put his hands over his head. *Id.* Upon frisking the defendant, the officer discovered that defendant was wearing an empty shoulder holster. *Id.* After handcuffing defendant but before advising him of his *Miranda* rights, the officer asked defendant where the gun was located. *Id.* Defendant nodded toward some empty cartons and responded that "the gun is over there." *Id.* The gun was retrieved and the defendant was then formally arrested and advised of his *Miranda* rights. The Supreme Court rejected defendant's argument that his statements regarding the gun should be suppressed, holding that
>
> > there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.

*Id.* at 655, 104 S.Ct. 2626, 81 L.Ed.2d 550.

> Just as in *Quarles,* Trooper Gillette in the instant case was understandably concerned about the possibility of another gun being found either on the person of defendant Copeland or in the automobile. It would be ludicrous as well as dangerous to require police officers to provide *Miranda* warnings before ascertaining whether any weapons are still within the reach of suspects. Such a rule would place the safety of both police officers and the public in jeopardy. *See Quarles,* 467 U.S. at 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (holding that the value of the Miranda warning was outweighed by safety concerns in situations "where spontaneity rather than adherence to a police manual is necessarily the order of the day"); *see also U.S. v. Williams,* 181 F.3d 945, 953–54 (8th Cir.1999).

*United States v. Hartwell,* 67 F.Supp.2d 784, 795–796 (E.D.Mich.1999), *aff'd on other grounds sub nom., United States v. Copeland,* 321 F.3d 582 (6th Cir.2003).

Accordingly, in *Hartwell* this Court applied the public safety exception and denied defendant Copeland's motion to suppress his statements. *See id.* at 796.

■ The Government argues that the Court should apply the public safety exception in the present case because "[t]he dangers in searching a vehicle seized for impoundment are obvious to anyone, and particularly to any experienced police officer; guns, knives, and needles are only the most immediately obvious things 'that's going to poke or hurt me or my partner.'" Gov't Supp. Br. at 10.

In *Hartwell,* the officers' concern for their safety was prompted by the seizure of a gun from one of the defendants. Here, Officer Simpson did not locate a weapon prior to questioning Defendant about the contents of his vehicle. Never-

theless, the Eighth Circuit's decision in *United States v. Williams*, 181 F.3d 945 (8th Cir.1999), cited in *Hartwell*, provides support for the application of the public safety exception in this case. In *Williams*, law enforcement officers had raided the apartment of the defendant, a suspected drug dealer. *See id.* at 947. Upon entering the defendant's bedroom, the officers located the defendant lying on his bed and placed him in handcuffs. *Id.* at 948. At trial, a deputy sheriff involved in the search testified that he entered the defendant's bedroom, placed the defendant in an upright position, informed him of the officers' purpose for entering the apartment, and then asked him, without providing *Miranda* warnings, " '[i]s there anything we need to be aware of?' " *Id.* at 948. The defendant responded to the question by stating that there was a gun in the closet. *Id.*

The Eighth Circuit concluded that the defendant's statement was admissible under the public safety exception to *Miranda*. *Id.* at 953. The court of appeals noted that

> [a]lthough Williams' hands were cuffed behind his back when the officers asked him if they needed to be aware of anything else, the officers could not have known if any armed individuals were present in the apartment or preparing to enter the apartment within a short period of time. Similarly, the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way.

*Id.* at 953–954 (footnote omitted).

Here, Officer Simpson and Officer Hall were faced with a potentially dangerous situation. Officer Simpson had just arrested Defendant at approximately 1:00 a.m. on a city street. Defendant's passenger remained in the vehicle, and Officer Simpson could not have known whether the passenger had access to weapons that would pose a threat to either himself or Officer Hall, who had proceeded to the passenger side of the vehicle. Moreover, the officers legally were entitled to conduct a search of the passenger compartment of the vehicle incident to Defendant's arrest. *See New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Hudgins*, 52 F.3d 115, 118–19 (6th Cir.1995). Officer Simpson could not have known whether there were weapons or other hazardous items in the vehicle that could harm the officers if they happened upon them unexpectedly while conducting the search of the vehicle. *Cf. United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir.1994) (finding statement admissible under public safety exception where, prior to administering *Miranda* warnings, officer asked defendant before searching him whether defendant had any drugs or needles on his person). Indeed, regardless of whether Officer Simpson asked Defendant whether there was anything in the vehicle that might "poke or hurt" the officers, or simply whether there was anything that he needed to know about, the Court concludes that these questions fall within the public safety exception to *Miranda*. Accordingly, the Court shall deny Defendant's motion to suppress his statement identifying the location of the forty-five caliber handgun in his vehicle.

## C. THE SEIZURE OF THE GUN FROM DEFENDANT'S VEHICLE

■ The Court has concluded that the police lawfully stopped Defendant's vehicle and placed him under arrest. Further, the Court has concluded that, under the public-safety exception, Defendant's statement regarding the presence of the gun in his automobile is admissible under the public

safety exception to *Miranda*. At oral argument, Defendant conceded that, if the stop of his vehicle was lawful, then the police were entitled to search his automobile incident to his arrest. The Court agrees.[7]

As noted above, Officer Simpson placed Defendant under arrest for driving without a license. At that point, the officers were entitled to search Defendant's vehicle incident to his arrest. *See Belton*, 453 U.S. at 460, 101 S.Ct. 2860 ("When a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."). "[E]ven after the arrestee has been separated from his vehicle and is no longer within reach of the vehicle or its contents, the *Belton* rule allowing a police officer to search a vehicle incident to a lawful arrest applies, and such a search is valid." *United States v. White*, 871 F.2d 41, 44 (6th Cir.1989).

As the Court has noted, Officer Simpson testified inconsistently with respect to whether Defendant had exited his vehicle immediately upon the officers' arrival on the scene, or whether Defendant was removed from the vehicle by Officer Simpson after begin questioned regarding his driver's license. *See supra* n. 2. However, even if Defendant had exited his vehicle prior to his conversation with Officer Simpson, the officers still were entitled to conduct a search incident to arrest. *See United States v. Hudgins*, 52 F.3d 115, 119–20 (6th Cir.1995). In *Hudgins*, the Sixth Circuit commented:

> Where the officer initiates contact with the defendant, either by actually confronting the defendant or by signaling confrontation with the defendant, while the defendant is still in the automobile, and the officer subsequently arrests the defendant (regardless of whether the defendant has been removed from or has exited the automobile), a subsequent search of the automobile's passenger compartment falls within the scope of *Belton* and will be upheld as reasonable.... However, where the defendant has voluntarily exited the automobile and begun walking away from the automobile before the officer has initiated contact with him, the case does not fit within *Belton*'s bright-line rule, and a case-by-case analysis of the reasonableness of the search under *Chimel* [*v. California*, 395 U.S. 752, 89 S.Ct. 2034,

7. Because the Court has found that Defendant's statement is admissible under the public safety exception to *Miranda*, the Court need not address the question of whether non-testimonial physical evidence, discovered as the result of a statement obtained in violation of *Miranda*, is subject to exclusion under *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), as fruit of the poisonous tree. The Court notes, however, that courts are currently divided on this issue following the Supreme Court's decision in *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *See, e.g., United States v. Patane*, 304 F.3d 1013, 1023 (10th Cir.2002) (discussing split among lower courts and courts of appeals); *Knuckles v. Brigano*, 70 Fed.Appx. 830, 836–37 (6th Cir.2003) (noting circuit split). Of course, even if the Court were to conclude that a *Miranda* violation warranted the exclusion of non-testimonial physical evidence, and that such a violation occurred in this case, the gun still would be admissible under the "inevitable discovery" doctrine. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received."). As discussed in this opinion, the officers were entitled to conduct a search of Defendant's automobile incident to his arrest under *Belton*. Thus, irrespective of any *Miranda* violation, the police would have discovered the gun through lawful means.

23 L.Ed.2d 685 (1969)] becomes necessary.

*Hudgins,* 52 F.3d at 119.

Here, before Defendant exited his vehicle, the police had signaled confrontation with Defendant when they activated the emergency lights and siren on their patrol car and pulled Defendant over on Dewey Street. *See Hudgins,* 52 F.3d at 120 ("Before defendant exited his automobile, the officers had signalled confrontation by turning on their blue lights, pulling defendant over to the side of the road, and asking defendant to step out of his automobile.") Moreover, even if Defendant began to exit his vehicle, there is no evidence that he moved very far from the vehicle prior to his conversation with Officer Simpson. Thus, this case is unlike *United States v. Strahan,* 984 F.2d 155 (6th Cir. 1993), where the Sixth Circuit found *Belton* inapplicable because the defendant was approximately thirty feet from his vehicle when he was arrested. *Id.* at 159. Accordingly, the Court finds no basis upon which to suppress the gun discovered in Defendant's automobile.

### D. DEFENDANT'S STATEMENTS AT THE POLICE STATION

■ Because the Court has concluded that there was no *Miranda* violation in this case, there is of course no basis for excluding Defendant's subsequent statements at the police station as the illegal fruits of a primary violation. *See Quarles,* 467 U.S. at 659–60, 104 S.Ct. 2626. Moreover, there is no independent basis for excluding Defendant's subsequent statements; Defendant does not dispute that he knowingly and voluntarily waived his *Miranda* rights prior to answering Sergeant Edwards' questions at the police station.

### III. CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant's motion to suppress evidence [docket entry 10] is **DENIED**.

**SO ORDERED.**